Daniel L. Reinganum
McDowell Law, PC
46 W. Main Street
Maple Shade, NJ 08052
856-482-5544 / DanielR@McDowellLegal.com
*Attorneys for Choates G. Contracting, LLC, Chapter 11 Debtor-in-Possession*

**Order Filed on June 8, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE:** | **Case No.: 21-13085-ABA** |
| **Choates G. Contracting, LLC** | **Chapter No.: 11** |
| | **Adv. No. 21-13085-ABA** |

### ORDER CONFIRMING CHAPTER 11, SUB-CHAPTER V DEBTOR'S FIRST POST-CONFIRMATION MODIFIED PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. §1191(B)

The relief set forth on the following pages, numbered two (2) through three (3) is hereby **ORDERED**.

**DATED: June 8, 2023**

Honorable Andrew B. Altenburg, Jr.
United States Bankruptcy Court

It appearing that Choates G. Contracting, LLC's Chapter 11, Subchapter V Debtor's First Post-Confirmation Modified Plan of Reorganization Dated March 16, 2023  (Doc. 240 , the "Modified Plan of Reorganization") as well as a Motion to Modify Chapter 11 Plan (Docket No. 243) having been served on creditors, equity security holder(s), and other parties in interest by the Debtor and transmitted to the Subchapter V trustee and to the United States Trustee; and it appearing that informal objections to confirmation were resolved by virtue of a compromise (see Docket No. 254, Docket No. 255), and it appearing that the Debtor may modify their previously confirmed plan of reorganization, and with no objections having been filed to confirmation of the Modified Plan, and the Court satisfied that the requirements for confirmation set forth in Section 1191(b) of the Bankruptcy Code having been satisfied, it is hereby:

**ORDERED** AS FOLLOWS:

1. The Modified Plan of Reorganization (attached hereto) is hereby confirmed pursuant to 11 U.S.C. §1193(c) and 11 U.S.C. §1191(b).

2. Confirmation of the Plan of Reorganization does not discharge any debt provided for in the Plan of Reorganization until the court grants a discharge pursuant to 11 U.S.C. §1192.

3. Douglas S. Stanger, the Subchapter V Trustee to the Debtor's Estate (the "Trustee") shall make all disbursements required under the Plan of Reorganization.

4. The Trustee shall make disbursements no less often than once every six months.  This shall not prohibit the Trustee from making disbursements more frequently than every six months.

5. The Trustee shall file with the Court reports of distributions under the plan semi-annually.

6. So long as this Order is entered in the month of June 2023, the Debtor's remaining plan payments under the Modified Plan of Reorganization are as follow:

    a. $20,000 within ten (10) days of confirmation of the Modified Plan of Reorganization;

  b. $5,500 per month, for seven (7) months, commencing July 1, 2023;

  c. $12,000 per month, for an additional thirty-six (36) months, commencing January 1, 2024.

7. The Court's Order Approving Settlement of Compromise entered in connection with the Motion to Approve Compromise (at Docket No. 254, Proposed Order Attached) are incorporated by reference into this Order and the terms set forth therein shall be alter the terms of the Modified Plan of Reorganization.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In re:   Choates G. Contracting, LLC

Case No.          21-13085-ABA

                    Debtor

Judge:            Andrew B. Altenburg, Jr.

Chapter 11 (Subchapter V)
Small Business

### CHAPTER 11, SUBCHAPTER V DEBTOR'S FIRST POST-CONFRMATION MODIFIED PLAN OF REORGANIZATION DATED MARCH 16, 2023

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR _____  IN  COURTROOM  No._____ AT THE   UNITED STATES BANKRUTPCY COURT, DISTRICT OF NEW JERSEY,  401 MARKET STREET, CAMDEN, NJ 08102**

**Your rights may be affected by this Plan. You should consider discussing this document with an attorney.**

**TABLE OF CONTENTS**

**Contents**

SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS.................5

ARTICLE 1: HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR.7

    1.1.   Nature of the Debtor's Business....................................................7

    1.2.   History of Business Operations of the Debtor ..........................7

    1.3.   Filing of the Debtor's Chapter 11 Case......................................7

    1.4.   Legal Structure and Ownership...................................................7

    1.5.   Debtor's Assets..............................................................................7

    1.6.   Debtor's Liabilities. .......................................................................7

    1.7.   Current and Historical Financial Conditions............................7

    1.8.   Events Leading to the Filing of the Bankruptcy Case...............8

    1.9.   Significant Events During the Bankruptcy Case......................10

    1.10.   Projected Recovery of Avoidable Transfers ........................10

ARTICLE 2: THE PLAN..............................................................................10

    2.1.   Unclassified Claims .....................................................................11

    2.2   Classes of Claims and Equity Interests.....................................14

    2.3.   Estimated Number and Amount of Claims Objections. ...........24

    2.4.   Treatment of Executory Contracts and Unexpired Leases. ...........24

    2.5.   Means for Implementation of the Plan, Consequences for Failure to Make
Plan Payments ......................................................................................25

    2.6   Events of Default, Material Default, and Consequences Thereof................27

    2.7.   Payments.......................................................................................29

    2.8.   Post-Confirmation Management..................................................29

    2.9.   Tax Consequences of the Plan. ..................................................29

    2.10. Projections in Support of Debtor's Ability to Make Payments Under the
Proposed Plan ......................................................................................30

ARTICLE 3: FEASIBILITY OF PLAN .......................................................30

    3.1.   Ability to Initially Fund Plan.......................................................30

3

3.2.    Ability to Make Future Plan Payments And Operate Without Further
Reorganization..................................................................................................30

ARTICLE 4: LIQUIDATION ANALYSIS ...................................................................30

ARTICLE 5: DISCHARGE ............................................................................................31

5.1.    Discharge...............................................................................................................31

ARTICLE 6.....................................................................................................................31

GENERAL PROVISIONS ..............................................................................................31

6.1.    Title to Assets. ......................................................................................................31

6.2.    Binding Effect........................................................................................................32

6.3.    Severability............................................................................................................32

6.4.    Retention of Jurisdiction by the Bankruptcy Court.............................................32

6.5.    Captions. ...............................................................................................................32

6.6.    Modification of Plan. ............................................................................................32

6.7.    Final Decree. .........................................................................................................33

ARTICLE 7: ATTACHMENTS .....................................................................................34

ARTICLE 8: FREQUENTLY  ASKED QUESTIONS ..................................................35

ARTICLE 9: DEFINITIONS .........................................................................................37

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

I.    THE CONFIRMED PLAN

The Debtor's Second Amended Chapter 11 Plan of Reorganization Dated October 19, 2021 (the 'Confirmed Plan') was confirmed by the Court pursuant to an Order confirming Chapter 11, Sub-Chapter V, Non-Consensual Plan of Reorganization entered December 22, 2021. **The Debtor now seeks to modify the Confirmed Plan.**

The Confirmed Plan provided for the surrender in full satisfaction of certain real properties as well as the payment in full of 100% of all unsecured claims and the secured claim of Philly Properties GP, LLC.

The Confirmed Plan provided for monthly payments by the Debtor to the Sub-Chapter V Trustee on the following payment schedule:

Year 1 :        $5,000 per month paid to the Sub-Chapter V Trustee;
Year 2 :        $10,000 per month paid to the Sub-Chapter V Trustee;
Years 3, 4, 5: $12,000 per month paid to the Sub-Chapter V Trustee;

The first payment under the Confirmed Plan was due January 1, 2022 and as such, the time period of a 'Year' in the Confirmed Plan matches the calendar year.

In addition, the Debtor proposed to liquidate their interest in the following properties in order to make additional payments under the plan.

a.  5300 Master Street, Philadelphia, PA
b.  13 Riviera Drive, Pennsville, NJ
c.  120 Peace Lane, Glassboro, NJ
d.  401 Cooper Landing Road, Suite C-4, Cherry Hill, NJ

However, the failure to liquidate any of these properties was not an event of default under the Confirmed Plan.

To the extent that there were net proceeds after the payment of secured claims, the Debtor was to pay over 80% of the net proceeds from each of these sales to the Sub-Chapter V Trustee for disbursement under the Chapter 11 Plan and retain 20% of the net proceeds for the payment of taxes and to fund operations. The payment arrearages with respect to secured obligations on the properties listed above (for sale/refinance) will be paid at the time of the sale/refinance.

In addition, the Debtor was obligated to sell real estate located at 122 Danton Lane, Mullica Hill, New Jersey within one year of confirmation of the plan.


II.    THE MODIFIED PLAN

5

The Modified Plan provides for the T the surrender in full satisfaction of the same real properties as well as the payment in full of 100% of all unsecured claims and the secured claim of Philly Properties GP, LLC.

The Modified Plan provides for monthly payments by the Debtor to the Sub-Chapter V Trustee on the following payment schedule:

| | |
|---|---|
| Year 1 (commencing January 1, 2022): | $5,000 per month paid to the Sub-Chapter V Trustee; |
| Year 2 (commencing January 1, 2023) : | No payments until Chapter 11 Modified Plan is confirmed.  Within ten (10) days of confirmation, Debtor or third party on bhalf of Debtor shall tender a sum to the Sub-V Trustee equal to $5,000 per month, calculated with as if payments were to commence March 1, 2023 |
| Years 3, 4, 5: | $12,000 per month paid to the Sub-Chapter V Trustee; |

**ORDER OF DISTRIBUTION:**

Throughout the duration of the Confirmed Chapter 11 Plan and the Modified Chapter 11 Plan payments shall be disbursed in a "waterfall" approach, with Administrative Expenses being paid first, then Priority Claims being paid second, then Secured Claims (including arrearages) being paid third, then Lease Arrearages being paid fourth, and general unsecured claims being paid fifth.

Claims in the same category shall be paid pro-rata.

Estate professionals may submit post-confirmation fee applications and if approved, those post-petition fees will be payable through the plan as an Administrative Expense.

6

## ARTICLE 1: HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1. **Nature of the Debtor's Business.**

The Debtor is a certified minority owned Real Estate Construction Company. The Debtor coordinates and performs construction services, often as a subcontractor, but from time to time as a general contractor. The Debtor typically uses union laborers to complete the work.

In addition, the Debtor owns numerous piece of real estate which were acquired for the purpose of holding and renting.

### 1.2. **History of Business Operations of the Debtor**

The Debtor was formed on or about February 21, 2018. In 2018 the Debtor had gross revenues of approximately $945,000. In 2019 the Debtor had gross revenues of approximately $953,000. In 2020 the Debtor had gross revenues of approximately $445,000.

### 1.3. **Filing of the Debtor's Chapter 11 Case.**

On April 15, 2021, the Debtor filed a voluntary petition for relief under the Bankruptcy Code. The Chapter 11 case is pending in the Bankruptcy Court in Camden, New Jersey.

### 1.4. **Legal Structure and Ownership.**

The Debtor is a New Jersey Limited Liability Company 100% owned by Darrell Choates.

### 1.5. **Debtor's Assets.**

See attached Exhibit A for a list of the Debtor's primary assets, fair market value of same, and the basis for valuation.

### 1.6. **Debtor's Liabilities.**

For secured obligations, see Exhibit B.

For all other obligations, also see Exhibit B.

### 1.7. **Current and Historical Financial Conditions.**

As of the commencement of the case, the Debtor had no operating projects, with significant projects to come during this year and the years to follow. The Debtor is currently in the process of getting work and jobs. The Debtor believes that the next few years of operation will be the best years.

7

This believe is based on the overall general improvement in the business climate – since COVID-19 and its lockdowns and restrictions have passed, there is pent up demand for the kinds of construction projects the Debtor completes.

Current financial information may be obtained by reviewing the Debtor's monthly operating reports which have been filed with the Court every month since the case was commenced.

      1.8.   **Events Leading to the Filing of the Bankruptcy Case,**

Two major events have caused the Debtor to need to file this Chapter 11 case.

First is the COVID-19 Pandemic.  As a result of lockdowns and shutdowns,  etc., the Debtor had significantly fewer projects to complete and as a result, construction revenues were down approximately 50% in 2020 as opposed to 2019 revenues.  Additionally, the pandemic emboldened a number of the Debtors' tenants, who ceased paying rent.  The Debtor was unable to compel payment through eviction due to various moratoria.  This loss of cash flow led to the Debtor falling behind on most of its secured obligations.

Second – prior to the filing of the bankruptcy case the Debtor hired an individual named Joseph Geromini to act as CEO and be responsible for the operations of the Debtor. Geremini entered into a series of contracts with Philly Properties GP, LLC and Drexel Properties GP, LLC  (common ownership, both creditors represented by same attorney). Geromini underbid the projects and mismanaged the construction.  Additionally, there were delays and cost overruns caused by Philly Properties GP, LLC and Drexel Properties GP, LLC  by virtue of their failure to have proper permitting and architectural drawings.  Philly Properties GP, LLC and Drexel Properties GP, LLC also fired the general contractor for the project (l2i) in the middle of construction.

The Debtor has determined that Geromini overpaid himself out of draws from the projects and ultimately the funding for the project ran out before it was completed.    Upon learning of what Geromini did, the Debtor terminated him[1].  On June 23, 2021 the US Department of Justice indicted Geromini with 10 counts of wire fraud and two counts of securities fraud, including charges relating to embezzlement from former employees.

Litigation ensued by both Philly Properties GP, LLC and Drexel Properties GP, LLC . Philly Properties GP, LLC obtained a judgment in Pennsylvania for approximately

---

[1] On June 23, 2021 the US Department of Justice indicted Geromini with 10 counts of wire fraud and two counts of securities fraud, including charges relating to embezzlement from his employer.  These actions occurred prior to Geromini being employed by the Debtor.  See https://www.justice.gov/usao-nj/pr/former-chief-operating-officer-philadelphia-technology-start-charged-securities-fraud-and

$240,000 which was domesticated in New Jersey shortly prior to the filing of the case.
Drexel Properties GP, LLC's lawsuit was still pending at the time of the bankruptcy case
filing.

Philly Properties GP, LLC levied on the Debtor's pre-petition bank accounts, leading to the
filing of this Chapter 11 bankruptcy case.

Following confirmation of the Chapter 11 Plan, the Debtor's revenues did not grow as
anticipated and the Debtor finds it is unable to pay $10,000 per month commencing in Year
2.

    1.9.   **Significant Events During the Bankruptcy Case.**

    i.     The Debtor commenced the Chapter 11 Case on April 15, 2021

    ii.    On April 20, 2021 Douglas Stanger, Esq. was appointed as the Sub-chapter V Trustee

    iii.   On May 7, 2021 McDowell Law, PC's retention as general counsel was approved by the Court.

    iv.   On May 21, 2021 Bradley K. Sclar, Esq.'s retention as special counsel was approved by the Court.

    v.     On May 27, 2021 the Debtor commenced an adversary proceeding against Philly Properties GP, LLC in Case No. 21-01281, seeking to avoid certain unperfected judgment liens.

    vi.   On May 28, 2021 Bederson LLP's retention as accountant to the Debtor was approved by the Court.

    vii.   On June 3, 2021 Kelli Fishbein was approved by the Court to act as realtor to the Debtor.

    viii.  The Lawsuit entitled Drexel Properties GP, LLC v. Choates G. Contracting & Darrell Choates, Sr., pending in the superior Court of New Jersey, Law Division, Gloucester County; GLO-L-000433-20 was stayed as to the Debtor by virtue of the bankruptcy filing.

    ix.   The Debtor filed a Chapter 11 Plan on July 13, 2021 which was withdrawn  on July 16, 2021.

    x.     The Debtor filed their First Amended Chapter 11 Plan on July 16, 2021.

    xi.   The Debtor filed their Second Amended Chapter 11 Plan on October 19, 2021

    xii.   The Court confirmed the Debtor's Second Amended Chapter 11 Plan on December 9, 2021 (order entered December 22, 2021).

    xiii.  The Debtor commenced an adversary proceeding against Scott E. Braidwood on August 14, 2022 seeking to avoid the fixing of a mortgage against the Debtor's real estate located at 122 Danton Lane, Mullica Hill, NJ.

    xiv.  On September 14, 2022 the Court entered an order conditionally approving the sale of 122 Danton Lane, Mullica Hill, NJ.

    xv.   In connection with the sale of 122 Danton Lane, Mullica Hill, NJ, the Debtor resolved the Braidwood adversary proceeding settled the claims of Turn-Key Management Corp., and resolved the objection of Philly Properties GP, LLC and Drexel Properties GP, LLC (See Docket No. 206, 207, 215)

    xvi.  The Debtor closed on the sale of 122 Danton Lane on December 23, 2022.

    xvii.

    1.10.  **Projected Recovery of Avoidable Transfers**

    NONE

## ARTICLE 2: THE PLAN

The Debtor's Plan must describe how its Creditors will be paid.  Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a clasfor purposes of

payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

### 2.1.   Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any class:

A.   Administrative Expenses

The Debtor must pay all Administrative Expenses in full.   If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1. If the Debtor trades in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

11

2. If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.

3. Administrative Expenses also include any post-petition fees and expenses allowed to professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 cases. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 | Any allowed claim of this type will be paid though the plan as an ADMINISTRATIVE EXPENSE |
| Administrative Tax Claim | $0.00 | Any allowed claim of this type will be paid though the plan as an ADMINISTRATIVE EXPENSE |
| The value of goods received in the ordinary course of business within 20 days before the Petition Date | $0.00 | Any allowed claim of this type will be paid though the plan as an ADMINISTRATIVE EXPENSE |

12

| | | |
|---|---|---|
| Professional fees, as approved by the Bankruptcy Court (through confirmation) | $57,940.35<br><br>All of these have been previously approved by the Court. | After Bankruptcy Court approval, Payment through the Plan as follows:<br><br>Any allowed claim of this type will be paid though the plan as an ADMINISTRATIVE EXPENSE |
| Professional fees, as approved by the Bankruptcy Court (post-confirmation) | $45,000 | After Bankruptcy Court approval, Payment through the Plan as follows:<br>Any allowed claim of this type will be paid though the plan as an ADMINISTRATIVE EXPENSE |
| Clerk's Office fees | $0.00 | Paid in full on the Effective Date. |
| Other Administrative Expenses | $0.00 | Any allowed claim of this type will be paid though the plan as an ADMINISTRATIVE EXPENSE |
| Trustee | INCLUDED IN PROFESSIONAL FEE ESTIMATES, ABOVE | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows:<br><br>Any allowed claim of this type will be paid though the plan as a ADMINISTRATIVE EXPENSE |
| TOTAL | $102,940 | |

B.    Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular

installments paid over a period not exceeding 5 years from the order of relief.

Each holder of a Priority Tax Claim will be paid as set forth in the chart below:

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| **State of New Jersey, Division of Taxation**<br><br>**Claim #1-1** | $1,671.24<br><br>Computed as $1,475.35 (as set forth in claim) plus pre-computed interest over 5 years at 5% interest rate | May 3, 2021 | Any allowed claim of this type will be paid though the plan as a PRIORITY CLAIM.<br><br>If for any reason, this claim has not been paid in full prior to April 15, 2026, the Debtor shall immediately pay any remaining amounts directly to the Creditor in order to satisfy the claim. |

### 2.2    Classes of Claims and Equity Interests.

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

A.  Classes of Secured Claims

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Code.  If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim. In addition, certain claims secured only by the

14

debtor's principal residence, may require different treatment pursuant to § 1190(3) of
the Code as set forth below, if applicable.

      The following chart lists all classes containing the Debtor's secured prepetition
Claims and their proposed treatment under the Plan:

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| CLASS 1 | *Secured claim of:* Nationstar Mortgage d/b/a Mr. Cooper<br><br>Collateral description: 122 Danton Lane Mullica Hill, New Jersey<br><br>Allowed Secured Amount = $409,464.74 **<br><br>Priority of lien = 1st Position Mortgage<br><br>Principal owed = $360,222.22<br><br>Pre-pet. arrearage = $24,567.11<br><br>Total claim = $ 409,464.74<br><br>** includes a potential pre-payment penalty of up to $17,077.69 | NO | IMPAIRED | CREDITOR WAS PAID IN FULL FROM SALE OF REAL PROPERTY ON DECEMBER 23, 2022 |

| CLASS 2 | *Secured claim of:*<br>City of Philadelphia / School District<br>of Philadelphia<br><br>Collateral description;<br>5300 Master Street,<br>Philadelphia, PA<br><br>Allowed Secured Amount =<br>$ 4,695.47<br>Priority of lien =<br>Super-priority<br>Municipal Lien<br><br>Principal owed =<br>$ 4,695.47<br><br>Pre-pet. arrearage =<br>$ 4,695.47<br> Total claim =<br>$ 4,695.47 | NO | NOT<br>IMPAIRED | CLAIM WAS<br>SATISFIED BY<br>DEBTOR'S<br>PRINCIPAL<br>FOLLOWING<br>CONFIRMATION<br>OF PLAN |

| CLASS 3 | *Secured claim of:*<br>City of Philadelphia / Water Revenue Bureau<br><br>Collateral description;<br>5300 Master Street,<br>Philadelphia, PA<br><br>Allowed Secured Amount =<br>$ 1,534.71<br>Priority of lien =<br>Super-priority<br>Municipal Lien<br><br>Principal owed =<br>$ 1,534.71<br><br>Pre-pet. arrearage =<br>$ 1,534.71<br> Total claim =<br>$ 1,534.71 | NO | NOT IMPAIRED | CLAIM WAS SATISFIED BY DEBTOR'S PRINCIPAL FOLLOWING CONFIRMATION OF PLAN |

17

| CLASS 4 | *Secured claim of*:<br>Sandra Ronessa Miller<br><br>Collateral description:<br>5300 Master Street<br>Philadelphia, PA<br><br>Allowed Secured Amount =<br>$ 90,000<br><br>Priority of lien =<br>1st Position<br>Mortgage Lien<br><br>Principal owed =<br>$ 90,000<br><br>Pre-pet. arrearage =<br>$ Unknown<br><br> Total claim =<br>$ 90,000 | NO | IMPAIRED | Claim to be paid in full at time of sale of Real Estate which is collateral for claim.<br><br>No distributions to be made by Sub-Chapter V Trustee in the plan.<br><br>Creditor shall retain their lien. |

| CLASS 5 | *Secured claim of*:<br>BSI FINANCIAL SERVICES<br><br>Collateral description =<br><br>73 West Road, Gibbstown, NJ<br><br>Allowed Secured Amount =<br>$ 213,265.65<br><br>Priority of lien =<br>1st Position Mortgage<br><br>Principal owed =<br>$ 213,265.65<br><br>Pre-pet. arrearage =<br>$ 213,265.65<br><br>(loan is matured)<br><br>Total claim =<br>$ $213,265.65 | NO | IMPAIRED | Debtor shall surrender all rights to the collateral property commonly described as 73 West Road, Gibbstown, NJ to BSI Financial Services as servicer for IRP Fund II Trust 2A, its transferees or assignees and agrees to granting Secured Creditor automatic in rem relief from the automatic stay to proceed with under its state and contractual rights.<br><br>This surrender shall fully satisfy the in personam debt owed by Debtor to BSI Financial Services as servicer for IRP Fund II Trust 2A, its transferees or assignees.<br><br>Creditor shall retain their lien on 73 West Road, Gibbstown, NJ |

19

| CLASS 6 | *Secured claim of*:<br>Pennsville Township<br><br>Collateral description =<br><br>13 Riviera Drive<br>Pennsville, NJ 08070<br><br>Allowed Secured Amount =<br>$ 16,052.59<br><br> Priority of lien =<br>Super-priority<br>Real Estate<br>Taxes<br><br>Principal owed =<br>$ 16,052.59<br><br>Pre-pet. arrearage =<br>$ 16,052.59<br><br><br> Total claim =<br>16,052.59 | NO | IMPAIRED | Claim to be paid in full at time of sale of Real Estate which is collateral for claim.<br><br>Amount to be paid to creditor will be determined under state law at time of sale.<br><br>No distributions to be made by Sub-Chapter V Trustee in the plan.<br><br>Creditor retains their lien on Riviera Drive, Pennsville, NJ 08070 |

| CLASS 7 | *Secured claim of*:<br>MidFirst Bank<br><br>Collateral description =<br><br>120 Peace Lane<br>Glassboro, NJ 08028<br><br><br>Allowed Secured Amount =<br>$ 52,424.11<br><br> Priority of lien =<br>1st Mortgage<br><br>Principal owed =<br>$ 28,124.11<br><br>Pre-pet. arrearage =<br>$ 31,678.47<br><br><br> Total claim =<br>$52,424.11 | NO | IMPAIRED | This debt is owed by the Estate of Rita Jones and is secured against 120 Peace Lane, Glassboro, NJ.<br><br>The Debtor holds a lease purchase option for $130,000 minus certain credits with Estate of Rita Jones, which would be responsible to pay this out of purchase proceeds.<br><br>Claim to be paid in full at time of sale of Real Estate which is collateral for claim.<br><br>No distributions to be made by Sub-Chapter V Trustee in the plan. |

21

| CLASS 8 | *Secured claim of*:<br>Philly Properties<br>GP, LLC<br><br>Collateral description =<br>5300 Master Street<br>Philadelphia, PA; AND<br>Judgment Lien against all<br>other real estate owned by the<br>Debtor.<br><br>Allowed Secured Amount =<br>$245,019<br><br>Priority of lien =<br>2nd position<br>judgment lien<br><br>Principal owed =<br>$ 245,019<br><br>Pre-pet. arrearage =<br>N/A<br><br>Total claim =<br>$ 245,019<br><br>• ** Creditor received approximately $92,983.77 from sale of 122 Danton Lane.<br><br>• ** Creditor carved-out $17,711.20 for Bankruptcy Estatee, which was paid to Sub-V Trustee, resulting in additional $17,711.20 reduction in secured claim, but creation of $17,711.20 general unsecured claim. | NO | IMPAIRED | Treatment of Lien:<br><br>Creditor shall retain their judgment lien in the amount of the Allowed Secured Amount against all properties that are collateral.<br><br>With respect to 5300 Master Street, Philadelphia, PA – Creditor shall retain 100% of net proceeds after payment of customary closing costs (including realty commission) and payment of superior liens.<br><br>With respect to New Jersey Properties ONLY - As the Debtor sells properties subject to Creditor's lien, Creditor shall retain 80% of net proceeds after payment of customary closing costs (including realty commission) and payment of superior liens.<br><br>With respect to New Jersey Properties ONLY -- Creditor shall provide the Bankruptcy Estate with a carve-out equal to 20% of net proceeds after payment of customary closing costs (including realty commission) and payment of superior liens.<br><br>Amounts provided to bankruptcy estate via carve-out shall give the Creditor a corresponding unsecured claim against the Debtor.<br><br>In New Jersey, Creditor's judgment lien shall retain its character as a docketed judgment lien. |

B. Classes of Priority Unsecured Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

The following chart lists all classes containing Claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| N/A | N/A | N/A | N/A |

C. Class[es]of General Unsecured Claims

General unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code. [Insert description of §1122(b) convenience class if applicable.]

The following chart identifies the Plan's proposed treatment of Class 14, which contains general unsecured Claims against the Debtor:

—

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 9 | General Unsecured Claims, including any unsecured portion of Philly Properties GP, LLC claim. | IMPAIRED | Any allowed claim of this type will receive 100% payment, to be paid though the plan as a GENERAL UNSECURED CLAIM |

D. Class[es] of Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are Equity Interest holders. In a partnership, Equity Interest holders include both general and limited partners. In a limited liability company ("LLC"), the Equity Interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the Equity Interest holder.

23

The following chart sets forth the Plan's proposed treatment of the class[es] of Equity Interest holders: [There may be more than one class of Equity Interest holders in, for example, a partnership case, or a case where the prepetition debtor had issued multiple classes of stock.]

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 15 | Equity Interest holders | UNIMPAIRED | Retain ownership of Debtor/Reorganized Debtor |

### 2.3.   Estimated Number and Amount of Claims Objections.

The Debtor may object to the amount or validity of any Claim within 60 days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan.  If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan. [Set forth amount and number of Claims in each class that will be objected to.]

| Class | Number of Claims Objected To | Amount of Claims Objected To |
|---|---|---|
|  |  |  |
|  |  |  |

### 2.4.    Treatment of Executory Contracts and Unexpired Leases.

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract.  The Debtor has the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval.  The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

Check all that apply:

[ X ]  Assumption of Executory Contracts.

The Executory Contracts shown on **EXHIBIT B** shall be assumed by the Debtor. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.  **EXHIBIT B** also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

Further, the Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly shown as assumed on **EXHIBIT C**, or not assumed before the date of the order confirming the Plan.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as an unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

**[The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of an Executory Contract Is _____ .** Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.]

### 2.5.   Means for Implementation of the Plan, Consequences for Failure to Make Plan Payments

### 2.5.1   Order of Distribution:

Throughout the duration of the Plan, Chapter 11 Plan payments shall be disbursed in a "waterfall" approach, with Administrative Expenses being paid first, then Priority Claims being paid second, then Secured Claims (including arrearages) being paid third, then Lease Arrearages being paid fourth, and general unsecured claims being paid fifth.

Claims in the same category shall be paid pro-rata.

### 2.5.2 – Periodic Payments

The Debtor will make monthly payments to the Sub-Chapter V Trustee, commencing the first day of the month following confirmation of the Plan as follows:

Year 1 (Commencing January 1, 2022):      $5,000 per month paid to the Sub-Chapter V Trustee;

Year 2:      No payments until Chapter 11 Modified Plan is confirmed.  Within ten (10) days of confirmation, Debtor shall tender a sum to the Chapter 11 Trustee equal to $5,000 per month, calculated with payments starting March 2023.  (i.e. if confirmed in April 2023, Debtor to tender 2 x $5,000 = $10,000;  if confirmed in June 2023, Debtor to tender 4 x $5,000 == $20,000)

25

Years 3, 4, 5: $12,000 per month paid to the Sub-Chapter V Trustee. Year 3 commences
January 1, 2024.

These payments will be funded by the future operations of the Debtor. If the Debtor's cash
flow is insufficient in any given month to pay the Sub-Chapter V Trustee, then the Debtor's
principal will attempt to cover the payment for that month from his own personal earnings
and assets.

### 2.5.3 – Sale of Real Properties

The Debtor shall sell the following properties within twelve (12) months of confirmation:

a.  5300 Master Street, Philadelphia, PA
b.  13 Riviera Drive, Pennsville, NJ
c.  120 Peace Lane, Glassboro, NJ

Any sale shall require bankruptcy court approval and the Debtor shall file motions to
approve each sale with a notice and opportunity for creditors to be heard thereon. Higher
and better offers will be entertained in connection with such sale motion. **The failure to
sell all of the properties shall constitute an event of default under the Plan.**

If the Debtor is unable to sell any of the properties as a result of a sale being
economically infeasible or economically inadvisable, then the Debtor may file a motion
to abandon such property under 11 U.S.C. §544. If abandonment is authorized, then the
failure to sell such property shall not be an event of default.

Within thirty (30) days of confirmation of the Modified Plan, Philly Properties GP, LLC
and Drexel Properties GP, LLC may recommend the real estate broker(s) to be used in
connection with the sales of the above-referenced properties. The Debtor **shall** engage the
recommended real estate broker(s), and authorize the real estate broker to discuss the status
of listings and offers with the Sub-V Trustee, Philly Properties GP, LLC, and Drexel
Properties GP, LLC. The Debtor shall promptly and seek approval of their employment
with this Court provided that i.) the real estate brokers are "disinterested" as to the Debtor;
and ii.) the commission does not exceed the customary 6% real estate commission.

If Philly Properties GP, LLC and Drexel Properties GP, LLC fail to recommend a real
estate broker within thirty (30) days of the Entry of this Order, then the Debtor may select a
real estate broker of the Debtor's choosing., who shall also be authorized to discuss the
status of listings and offers with the Sub-V Trustee, Philly Properties GP, LLC and Drexel

26

Properties GP, LLC.  All real estate brokers' employment and compensation shall be subject to review and approval by the Court.

The initial listing price for the properties will be set jointly by the Debtor, on the one hand, and Philly Properties GP, LLC and Drexel Hill Properties, GP, LLC on the other hand.  The pricing shall be guided by the realtor's recommended listing price.  In the event there is a disagreement between the Debtor and  Philly Properties GP, LLC and Drexel Hill Properties, GP, LLC as to list price, the parties shall submit the dispute to Douglas Stanger, the Sub-V Trustee who shall act as a binding arbitrator of the dispute.  Mr. Stanger will be entitled to hourly compensation as an administrative expense for these services.  Price adjustments to the listing price will be made at the suggestion of the broker and by agreement of Debtor and Philly Properties GP, LLC and Drexel Hill Properties, GP, LLC.  Disputes to be settled by Douglas Stanger as arbitrator.

Once a property is listed, the Debtor shall be obligated to accept any offer from a *bona fide* and qualified buyer so long as the offer is within 2% of the current list price.  The Broker shall be authorized to communicate all offers both to the Debtor, Debtor's counsel, the Sub-V Trustee, and to counsel for Philly Properties GP, LLC and Drexel Hill Properties, GP, LLC.  However the Debtor shall ultimately be responsible for ensuring that all offers are presented to the Sub-V Trustee and counsel to Philly Properties GP, LLC and Drexel Hill Properties, GP, LLC, regardless of whether the Debtor believes the offer is *bona fide*, or the buyer qualified.

**Upon Confirmation of the Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equitable Interests except as provided in the Plan, to the Debtor.  The Debtor expects to have sufficient cash on hand to make the payments required on the Effective Date.**

### 2.6 <u>Events of Default, Material Default, and Consequences Thereof</u>

In the event that the Debtor fails to:

i.)     Make all Chapter 11 Plan Payments to the Sub-V Trustee when due;
ii.)    Comply with the obligations set forth in Section 2.3.5, above; or
iii.)   Comply with any other material term or provision of the Modified Chapter 11 Plan

Then the Debtor shall be in Default of their Chapter 11 Plan Obligations.

Upon an event of Default, the Sub-V Trustee, the USTO, or any creditor may file a certification of default with respect to the Plan with the Court.  This certification must be served upon the Debtor, Debtor's Counsel, the United States Trustee's Office, the Sub-V

Trustee, and all other creditors.

The Debtor shall have an opportunity to respond and either cure the default prior to the date of a hearing on such certification of default, or have an opportunity to cure if so permitted by the Court at the hearing on the certification of default.

In the event that the default is not cured by the Debtor prior to the hearing or following the hearing in accordance with the Court's order, then the Debtor shall be in Material Default of the Chapter 11 Plan.

Upon the occurrence of a Material Default of the Chapter 11 Plan, then the Sub-V Trustee or any creditor may certify to the Court that the Debtor has failed to meet these deadlines, on notice to the Debtor, Debtor's Counsel, the United States Trustee's Office, the Sub-V Trustee, and all other creditors.  If the Court finds that the Debtor is in Material Default and that no just cause exists for extending the Debtor's opportunity to cure the Material Default, then the Court **shall** order appropriate relief.

If applicable, the Board of Directors of the Debtor immediately prior to the
Effective Date shall serve as the initial Board of Directors of the Reorganized Debtor on
and after the Effective Date. Each member of the Board of Directors shall serve in
accordance with applicable non-bankruptcy law and the Debtor's certificate or articles of
incorporation and bylaws, as each of the same may be amended from time to time.

### 2.7.  Payments.

The Sub-V Trustee shall act as disbursing agent and  shall make all Plan payments
to creditors under the Plan.

### 2.8.  Post-Confirmation Management.

The Post-Confirmation Officers/Managers of the Debtor, and their compensation,
shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| Darrell Choates, Sr. | CEO | **DEFERRED.** Mr. Choates shall be entitled to salary of $60,000 per year.  However payment of that salary shall be deferred until after the completion of the Chapter 11 Plan and Mr. Choates shall subordinate his right to this payment to the rights of all creditors. |

### 2.9.  Tax Consequences of the Plan.

*Creditors and Equity Interest Holders Concerned with How the Plan May
Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys,*

29

*And/Or Advisors.*

The following are the anticipated tax consequences of the Plan: [List the following general consequences as a minimum: (1) Tax consequences to the Debtor of the Plan; (2) General tax consequences on Creditors of any discharge, and the general tax consequences of receipt of Plan consideration after Confirmation.]

### 2.10. Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan

Debtor has provided projected financial information. Those projections are listed in **Exhibit D.**

## ARTICLE 3: FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 3.1.    Ability to Initially Fund Plan.

The Debtor believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

### 3.2.   Ability to Make Future Plan Payments And Operate Without Further Reorganization.

The Debtor must submit all or such portion of the future earnings or other future income of the Debtor to the supervision and control of the Trustee as is necessary for the execution of the Plan.

The Debtor has provided projected financial information. Those projections are listed in **EXHIBIT D** (referenced in § 2.9, above).

The final Plan payment is expected to be paid on **OR BEFORE** 60 months after confirmation of the original Chapter 11 Plan.

**You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.**

## ARTICLE 4: LIQUIDATION ANALYSIS

30

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. As unsecured creditors will receive a 100% distribution, this test is met.

## ARTICLE 5: DISCHARGE

### 5.1. Discharge.

**If the Plan is confirmed under § 1191(a),** on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or

**If the Plan is confirmed under § 1191(b),** as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan, except any debt—

(1) on which the last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the court; or

(2) if applicable, of the kind specified in section 523(a) of this title.

## ARTICLE 6
## GENERAL PROVISIONS

### 6.1. Title to Assets.

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtor.

If a plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first. Except as provided

31

in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the estate.

### 6.2.    Binding Effect.

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

### 6.3.    Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 6.4.    Retention of Jurisdiction by the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193; (iii) to hear  and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action.

### 6.5.    Captions.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

### 6.6.    Modification of Plan.

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under Section 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6.7.    Final Decree.

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

## ARTICLE 7: ATTACHMENTS

The following documents accompany the Plan [check those applicable, and list any other attachments here]:

[ X ]   Debtor's Assets at Fair Market Value, annexed as Exhibit A.___

[ X ]   Debtor's Liabilities, annexed as Exhibit __B__.\

[ X ]   Proposed New Lease between Debtor and Principal of Debtor

[ X ]   Financial forecast for the Debtor, annexed as Exhibit ___D

[ X ]   Executory Contracts and Unexpired Leases, to be Assumed annexed as Exhibit __C__.

[ X ]   Executory Contracts and Unexpired Leases to be Rejected, annexed as Exhibit __C__.

[ X ]   Liquidation Analysis, annexed as Exhibit __E__.

34

## ARTICLE 8: FREQUENTLY ASKED QUESTIONS

**What Is Choates G. Contracting, LLC Attempting to Do in Chapter 11?**
Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11. The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a plan of reorganization [or liquidation], the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If the creditors are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

**How Do I Determine Which Class I Am In?** To determine the class of your claim or interest, you must first determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your claim is unsecured. The Table of Contents will direct you to the treatment provided to the class in which you are grouped. The pertinent section of the Plan dealing with that class will explain, among other things, who is in that class, what is the size of the class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed.

**Why Is Confirmation of a Plan of Reorganization Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Reorganization]?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**Am I Entitled to Vote on the Plan?** Any creditor of the Debtor whose claim is IMPARIED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the

Bankruptcy Court to confirm the Plan.

####  How Do I Determine Whether I Am in an Impaired Class?

Section 2, Paragraphs 2.1 and 2.2 identifies the classes of creditors whose claims are impaired. If your claim is impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?**   The Plan is being distributed to all claim holders for their review, consideration and approval.  The deadline by which ballots must be returned is _____.  Ballots should be mailed to the following address:

> McDowell Law, PC
> Attn: Daniel Reinganum / Choates Balloting
> 46 W. Main Street
> Maple Shade, NJ 08052

**How Do I Determine When and How Much I Will Be Paid?** In Section/Paragraph 2.5, the Debtor has provided both written and financial summaries of what it anticipates each class of creditors will receive under the Plan.

36

## ARTICLE 9: DEFINITIONS

**9.1.**    The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Code are for convenience of reference only, and are superseded by the definitions found in the Code.

**9.2.    Administrative Claimant**: Any person entitled to payment of an Administration Expense.

**9.3.    Administrative Convenience Class:**    A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

**9.4.    Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

**9.5    Administrative Tax Claim**: Any tax incurred pursuant to Section 503(b)(1)(B) of the Code.

**9.6.    Allowed Claim**: Any claim against the Debtor pursuant to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.7.    Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**9.8.    Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code

**9.9.    Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**9.10.    Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**9.11.    Bankruptcy Court**: The United States Bankruptcy Court for the District of New Jersey.

**9.12.    Bankruptcy Rules**:  The Federal Rules of Bankruptcy Procedure.

**9.13.    Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

**9.14.    Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Choates G. Contracting, LLC is the Debtor-in-Possession.

**9.15    Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**9.16.    Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**9.17.    Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

**9.18.    Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

9.19.    **Confirmation Hearing**: The hearing to be held on _____, 20__ to consider confirmation of the Plan.

9.20.    **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

9.21.    **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

9.22.    **Debtor** and **Debtor-in-Possession**: [Debtor], the debtor-in-possession in this Chapter 11 Case.

9.23.    **Disputed Claim:** Any claim against the Debtor pursuant to Section 502 of the Code that the Debtor has in any way objected to, challenged or otherwise disputed.

9.24.    **Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims.

9.25.    **Effective Date**: Pursuant to D.N.J. LBR 3020-1, the effective date of a chapter 11 plan is 30 days after entry of the order confirming the plan unless the plan or confirmation order provides otherwise.

9.26.    **Equity Interest**: An ownership interest in the Debtor.

9.27.    **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

9.28.    **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

9.29.    **IRC**: The Internal Revenue Code

9.30.    **Petition Date**: April 15, 2021, the date the chapter 11 petition for relief was filed.

9.31.    **Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

9.32.    **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**9.33.   Reorganized Debtor**: The Debtor after the Effective Date.

**9.34.   Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

**9.35.   Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

**9.36.   Trustee**:  Douglas Stanger, Esq. the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

**9.37.   Unsecured Creditor**: Any Creditor that holds a Claim in the Chapter 11 case which is not a secured Claim.


Respectfully submitted,



BY:/s/ Daniel L. Reinganum
Daniel L. Reinganum
McDowell Law, PC
46 W. Main Street
Maple Shade, NJ 08052

40

# EXHIBIT A

# ASSETS & SECURED DEBTS

FOLLOWING SALE OF 122 DANTON LANE, MULLICA HILL
NEW JERSEY

Real Estate:

1.  5300 Master Street, Philadelphia, PA 19131

    VALUE:                  $200,000

    SECURED DEBTS:          $4,695.47 – City of Philadelphia/ School District of
                            Philadelphia

                            $1,534.71 – City of Philadelphia / Water Revenue Bureau

                            $90,000 – Private Mortgage in favor of Sandra Ronessa
                            Miller

                            $134,324.03 – Philly Properties GP, LLC Pennsylvania
                            Judgment Lien in Case No. 2020-14046, following
                            payments and reclassifications due to sale of 122 Danton
                            Lane.

    BASIS FOR VALUATION:  Debtor's principal's projected sales value within next 12
    months

2.  122 Danton Lane, Mullica Hill, NJ 08062 - SOLD 12/23/2022

                                    .

3.  73 West Road, Gibbsboro, New Jersey

    VALUE:                  $260,000

    SECURED DEBTS:          $213,265.65 – Mortgage in favor of BSI Financial Services

BASIS FOR VALUATION:  Debtor's principal's projected sales value within next 12 months.

4.  13 Riviera Drive, Pennsville, NJ 08070

VALUE:        $Unknown (as is – vacant lot); or ($370,000 if  a home is built on site)

SECURED DEBTS:   $16,052.59 – real estate taxes in favor of Pennsville Township

BASIS FOR VALUATION: Debtor's principal's projected sales value within next 12 months.

5.  120 Peace Lane, Glassboro, NJ 08028

** Debtor has a  lease-purchase option with the Estate of Rita  D. Jones.  The Debtor can purchase the property for $130,000 minus credit for payments made to date. **

VALUE:        $220,000 or more

SECURED DEBTS:    $130,000 – in favor of the Estate of Rita D. Jones (under lease purchase agreement).  Property is also subject to a 1st mortgage in favor of MidFirst Bank in the amount of $52,424.11, which would need to be satisfied by the Estate of Rita D. Jones at the time the Debtor exercises its option to purchase.

BASIS FOR VALUATION: Zillow.com, Debtor's principal

Case 21-13085-ABA    Doc 240-2    Filed 03/20/23    Entered 03/20/23 09:46:24    Desc
Joint Order Scheduling Pretrial Proceedings and Trial B - All Claims    Page 1 of 1

Choates G. Contracting
CLAIMS AS OF CONFIRMATION OF PLAN AND LEAD UP TO SALE OF 122 DANTON LANE

| Creditor | Amount | Class Under the Plan | Type of Claim | Priority of Claim | Amount to Be Paid | Claim # - if filed | Notes |
|---|---|---|---|---|---|---|---|
| **ADMINISTRATIVE** | | | | | | | |
| McDowell Law - Debtor Atty  Fee- Approved @ #140 | $   29,977.50 | Administrative | Admin | 1 | $    29,977.50 | Docket 140 | |
| McDowell Law - Debtor Atty  Expenses- Approved @ #140 | $    3,207.24 | Administrative | Admin | 1 | $     3,207.24 | Docket 140 | |
| Douglas Stanger - Sub-V TR Fee - Approved @ 141 | $    7,660.00 | Administrative | Admin | 1 | $     7,660.00 | Docket 141 | |
| Douglas Stanger - Sub-V TR Expenses - Approved@141 | $      100.00 | Administrative | Admin | 1 | $       100.00 | Docket 141 | |
| Bradley Sclar - Special Counsel Fee - Approved @146 | $    2,900.00 | Administrative | Admin | 1 | $     2,900.00 | Docket 146 | |
| Bradley Sclar - Special Counsel Expense - Approved @ 146 | $       35.71 | Administrative | Admin | 1 | $        35.71 | Docket 146 | |
| Bederson LLP - Accountant Fees - Approved @155 | $   13,986.00 | Administrative | Admin | 1 | $    13,986.00 | Docket 155 | |
| Bederson LLP - Accountant Expenses- Approved @155 | $       73.90 | Administrative | Admin | 1 | $        73.90 | Docket 155 | |
| McDowell Law - Debtor Atty Supplemental Fee - | | | | | | | |
| McDowell Law - Debtor Atty Supplemental Expenses | | | | | | | |
| Douglas Stanger - Sub-V TR Fee - Supplemental | | | | | | | |
| Douglas Stanger - Sub-V TR Expenses - Supplemental | | | | | | | |
| | | | | | | | |
| **PRIORITY TAX CLAIMS** | | | | | | | |
| State of New Jersey | $    1,671.24 | Priority Tax Claim | Priority Unsecur | 2 | $     1,671.24 | 1 | |
| | | | | | | | |
| **SECURED** | | | | | | | |
| US Bank for Velocity Commercial Capital / Nationstar | $ 409,464.74 | | 1 Secured | 0 | $          - | 9 | Satisfied outside of plan through sale of property 12/23/2022 |
| City of Philadelphia / School District | $    4,695.47 | | 2 Secured | 0 | $          - | 4 | Satisfied outside of plan by Debtor's principal |
| City of Philadelphia / Water Revenue Bureau | $    1,534.71 | | 3 Secured | 0 | $          - | 6 | Satisfied outside of plan by Debtor's principal |
| Sandra Ronessa Miller | $   90,000.00 | | 4 Secured | 0 | $          - | NONE | No distributions through plan |
| BSI Financial Services | $ 213,265.65 | | 5 Secured | 0 | $          - | 5 | No Distributions.  Surrendered in full satisfaction. |
| Pennsville Township | $   16,052.59 | | 6 Secured | 0 | $          - | 3 | No distributions through plan |
| MidFirst Bank | $   52,424.11 | | 7 Secured | 0 | $          - | 10 | No distributions through plan |
| Philly Properties GP, LLC | $ 245,019.00 | | 8 Secured | 3 | $   245,019.00 | | |
| | | | | | | | |
| **UNSECURED** | | | | | | | |
| Sunbelt Rentals | $   10,734.60 | General Unsecured | General Unsecu | 4 | $    10,734.60 | 2 | |
| Philly Properties GP, LLC | $          - | General Unsecured | General Unsecu | 4 | $          - | 7 | |
| Drexel Properties GP, LLC | $ 264,981.00 | General Unsecured | General Unsecu | 4 | $   264,981.00 | 8 | |
| Turnkey Management Corp. | $    6,700.00 | General Unsecured | General Unsecu | 4 | $     6,700.00 | 11 | |
| Scott E. Braidwood | $   18,565.00 | General Unsecured | General Unsecu | 4 | $    18,565.00 | 12 | |
| | | TOTAL PLAN FUNDING REQUIRED | | | $   605,611.19 | | |

# EXHIBIT C

# EXECUTORY CONTRACTS

## I.   CONTRACTS TO BE ASSUMED:

| COUNTER-PARTY | DESCRIPTION | CURE OF ARREARS |
|---|---|---|
| Daniel Green | Residential Room Rental of 120 Peace Lane, Glassboro, NJ (Debtor is landlord) | N/A |
| Scott Polar | Residential Room Rental of 120 Peace Lane, Glassboro, NJ (Debtor is landlord) | N/A |
| Norman G. Copsetta, Jr. | Lease purchase Option for 401 Cooper Landing Road, Suite C-4 Cherry Hill, NJ | Paid through the Chapter 13 Plan as a CATEGORY 3 CLAIM |
| Estate of Rita Jones | Lease purchase Option for 120 Peace Lane | Any arrears will be cured at time of sale of 120 Peace Lane |
| Lake Property Development, LLC | Joint Venture Agreement | N/A |
| Jasmine Hawthorne | Residential Lease of 5300 Master Street, Philadelphia, PA | N/A |
| | | |
| | | |

## II.   CONTRACTS TO BE REJECTED:

| COUNTER-PARTY |
|---|
| Bittenbender Construction, LP |
| Tashira Good -  – Residential Lease  73 West Road, Glassboro, NJ (Tenant not paying) |
| |

## III.  CONTRACTS TO BE ENTERED INTO AT CONFIRMATION:

| COUNTER-PARTY | DESCRIPTION | CURE OF ARREARS |
|---|---|---|
| Darrell Choates, Sr. (Principal of Debtor) | Residential lease of 122 Danton Lane, Mullica Hill, New Jersey at rate of $5,000 per month.<br><br>SEE ATTACHED FORM | N/A |



NEW JERSEY REALTORS® STANDARD FORM OF
RESIDENTIAL LEASE

©2001 NEW JERSEY REALTORS®, INC.

**THIS IS A LEGALLY BINDING LEASE THAT WILL BECOME FINAL WITHIN THREE BUSINESS DAYS.
DURING THIS PERIOD YOU MAY CHOOSE TO CONSULT AN ATTORNEY WHO CAN REVIEW AND CANCEL
THE LEASE. SEE SECTION ON ATTORNEY REVIEW FOR DETAILS.**

## TABLE OF CONTENTS

1. CONDO/CO-OP RIGHT OF TERMINATION
2. PROPERTY
3. TERM
4. RENT
5. INITIAL DEPOSIT
6. SECURITY DEPOSIT
7. LATE PAYMENT PENALTY
8. ADDITIONAL RENT
9. POSSESSION AND USE
10. UTILITIES
11. NO ASSIGNMENT OR SUBLETTING
12. VIOLATION, EVICTION & RE-ENTRY
13. DAMAGES
14. QUIET ENJOYMENT
15. TENANT'S REPAIRS AND MAINTENANCE
16. LANDLORD REPAIRS
17. ACCESS TO THE PROPERTY

18. NO ALTERATIONS OR INSTALLATION OF EQUIPMENT
19. INSPECTION
20. INSURANCE
21. FIRE AND OTHER CASUALTY
22. LIABILITY OF LANDLORD & TENANT
23. PETS
24. NOTICES
25. NO WAIVER
26. SEVERABILITY
27. RENEWAL OF LEASE
28. FURNITURE
29. END OF TERM
30. ASSOCIATION BYLAWS, RULES & REGULATIONS
31. BINDING
32. ENTIRE AGREEMENT
33. ATTORNEY REVIEW CLAUSE
34. BROKER'S COMMISSION

35. LEAD-BASED PAINT DOCUMENT ACKNOWLEDGMENT
36. WINDOW GUARD NOTIFICATION
37. MEGAN'S LAW STATEMENT
38. CONSUMER INFORMATION STATEMENT
    ACKNOWLEDGMENT
39. DECLARATION OF LICENSEE BUSINESS
    RELATIONSHIP
40. ACKNOWLEDGMENT OF TRUTH IN RENTING
    STATEMENT
41. SMOKE DETECTORS, CARBON MONOXIDE ALARM
    AND PORTABLE FIRE EXTINGUISHER COMPLIANCE
42. PRIVATE WELL TESTING
43. SECURITY CAMERAS
44. MEGAN'S LAW REGISTRY
45. OTHER LEASE PROVISIONS

## RESIDENTIAL LEASE AGREEMENT

**BETWEEN LANDLORD(S):** Choates G. Contracting, LLC

**whose address is/are** 122 Danton Lane, Mullica Hill, NJ 08062

**AND TENANT(S):** Darrell S. Choates, Sr.

**whose address is/are** 122 Danton Lane, Mullica Hill, NJ 08062

The word "Landlord" as used in this Lease means all of the landlords above listed. In all instances in which the Landlord may exercise rights or perform obligations under this Lease, it may do so through its authorized agents or representatives.

The word "Tenant" as used in this Lease means all of the tenants above listed.

**1. CONDOMINIUM/CO-OPERATIVE RIGHT OF TERMINATION:** (The following statement generally, as required by law, must be included in a lease for a condominium or cooperative unit.) THIS BUILDING IS BEING CONVERTED TO OR IS A CONDOMINIUM OR COOPERATIVE. YOUR TENANCY CAN BE TERMINATED UPON 60 DAYS NOTICE IF YOUR APARTMENT IS SOLD TO A BUYER WHO SEEKS TO PERSONALLY OCCUPY IT. IF YOU MOVE OUT AS A RESULT OF RECEIVING SUCH A NOTICE, AND THE LANDLORD ARBITRARILY FAILS TO COMPLETE THE SALE, THE LANDLORD SHALL BE LIABLE FOR TREBLE DAMAGES AND COURT COSTS.

**2. PROPERTY:** The Tenant agrees to lease from the Landlord and the Landlord agrees to lease to the Tenant (the single family home) (apartment # _____) (condominium unit #_____) (townhouse unit #_____) having a street address of 122 Danton Lane located in Mullica Hill _____, New Jersey (referred to as the "Property").




New Jersey Realtors® Form-125-4/17     Page 1 of 8

Tenant's
Initials: _____

Landlord's
Initials: _____

**3. TERM:** The Term of this Lease is for _____ (months) (years) starting on _____
_____ and ending on _____. This is referred to
as the "Term". If the Landlord is unable to give possession of the Property to the Tenant on the first day of the Term, the Landlord shall
not have any liability to the Tenant. However, the Tenant shall not be liable for the payment of rent until the Landlord gives possession of
the Property to the Tenant. If the Landlord fails to give possession of the Property within 30 days of the start date set forth above, then
the Tenant may terminate this Lease by giving notice to Landlord. If the first day of the Term is delayed, then the last day of the Term
shall be adjusted accordingly, so that the Term remains for the number of months or years above stated.

**4. RENT:** The rent for the Term of this Lease is $ __60,000__, to be paid as follows: $ __5,000__ per month, which is
due on the __1st__ day of each month. Rent shall be payable to: __Choates G. Contracting, LLC__
_____.
(NAME AND ADDRESS)

**5. INITIAL DEPOSIT:** Tenant has paid an initial deposit of $ ____0____ received on ____0____ that will
be credited towards _____ the first month's rent or _____ the Security Deposit. The balance shall be paid as fol-
lows: First month's rent $ __$5,000__ Due on _____, Security Deposit
$_____ Due on _____.

**6. SECURITY DEPOSIT:** The Tenant shall pay to the Landlord the sum of $ __0.00__ (the "Security Deposit," which can-
not exceed one and one-half months rent) to assure that the Tenant performs all of the Tenant's obligations under this Lease. If the
Landlord collects any additional Security Deposit, the additional security collected annually shall not be greater than 10 percent of the
current Security Deposit. Landlord shall comply with the Rent Security Deposit Act, N.J.S.A. 46:8-19 et seq. (the "Act"), unless this Lease
is for owner occupied Property with not more than two rental units or is a seasonal tenancy of not more than 125 consecutive days. Any
attempt to waive the requirements of the Act is prohibited and void as a matter of law.

The Act requires depositing the Security Deposit into a banking institution or investment company in New Jersey and notifying the Tenant in
writing of the name and address of the banking institution or investment company, the type of account in which the Security Deposit is deposited
or invested (for example, interest bearing or money market), the amount of the Security Deposit, and the current rate of interest for the account
within 30 days of each of the following: (a) the Landlord's receipt of the Security Deposit from the Tenant; (b) the Landlord moving the deposit
from one institution or fund to another (unless the move is due to a merger, in which case a notice to the Tenant must be within 30 days of receipt
of notice by the Landlord of the merger if the merger occurs more than 60 days prior to the annual interest payment); or (c) the transfer or convey-
ance of ownership or control of the Property. Such notice also must be provided at the time of each annual interest payment. All interest earned
on the Security Deposit shall be paid to the Tenant in cash or be credited toward the payment of rent due under this Lease upon the anniversary
date of this Lease, the renewal of the Term or on January 31, if the Landlord gives the Tenant written notice that interest will be paid on January
31.

The Act also provides that, if the Landlord sells or conveys the Property during the Term of this Lease, the Landlord will transfer
the Security Deposit plus the undistributed interest to the new owner. The Landlord shall notify the Tenant of the sale or conveyance, as
well as the name and address of the new owner. The notice shall be given by registered or certified mail within five days after conveyance
of title. After acquisition of the Property, the new owner shall be liable for investing the Security Deposit, making all interest payments,
giving all notices and returning the Security Deposit as required under the Act, even if the Landlord fails to transfer the Security Deposit.

The Landlord shall inspect the Property after the Tenant vacates at the end of the Term. Within 30 days of the termination of this
Lease, the Landlord shall return the Security Deposit plus the undistributed interest to the Tenant, less any charges expended by the Land-
lord for damages to the Property resulting from the Tenant's occupancy. The interest and deductions shall be itemized in a statement by
the Landlord, and shall be forwarded to the Tenant with the balance of the Security Deposit by personal delivery, or registered or certified
mail. The Security Deposit may not be used by the Tenant for the payment of rent without the written consent of the Landlord.

**7. LATE PAYMENT PENALTY:** If the Tenant does not pay the rent by the __5th__ day of the month, the Tenant shall pay
a late charge of _____ until the rent is received by Landlord. The late charge shall be added to the rent, and shall be considered
as additional rent, which is defined in Section 8. In the event any rent check is returned unpaid due to insufficient funds, the Tenant agrees
to pay the Landlord a $_____ processing charge. In such event, the Landlord reserves the right to demand that future rent
payments be made in cash, bank or certified check.

**8. ADDITIONAL RENT:** Landlord may perform any obligations under this Lease which are Tenant's responsibility and which
Tenant fails to perform. The cost to Landlord for such performance may be charged to tenant as "additional rent" which shall be due
and payable with the next installment of monthly rent. Landlord has the same rights against Tenant for failure to pay additional rent as
Landlord has for Tenant's failure to pay monthly rent. This means that the Landlord may evict Tenant for failure to pay additional rent.

**9. POSSESSION AND USE:** The Landlord shall give possession of the Property to the Tenant for the Term of this Lease except as
otherwise provided in this Lease. The Tenant shall occupy the Property only as a private residence, and will not use the Property for any
business, trade or profession. The Tenant shall not store any flammable, dangerous or hazardous materials at the Property, other than
ordinary household cleaning materials. The Property shall not be allowed to be vacant for any extended period of time.

| Tenant's | Landlord's |
|---|---|
| Initials: _____ | Initials: _____ |

**10. UTILITIES:** The Tenant shall arrange to have the utilities transferred into Tenant's name prior to occupancy, and shall be responsible for paying the following utility services:  ☒ Gas  ☒ Electric  ☐ Water  ☒ Heat  ☐ Sewer  ☐ General Trash Disposal  ☐ (Other) _____.

The Landlord shall provide and pay for the following utility services:  ☐ Gas  ☐ Electric  ☐ Water  ☐ Heat  ☒ Sewer  ☒ General Trash Disposal  ☐ (Other) _____. The Tenant agrees not to waste or unreasonably use any utility or appliance that is provided by the Landlord. Landlord shall not be responsible for any damage or loss caused to Tenant or Tenant's property because of an interruption in utility services over which Landlord has no reasonable means of control. Any such interruption shall not be grounds for Tenant to reduce or stop paying rent.

**11. NO ASSIGNMENT OR SUBLETTING:** The Tenant may not assign this Lease, sublet all or any part of the Property, or permit any other person to use the Property without the prior written permission of the Landlord. The Landlord may withhold such permission in Landlord's sole and absolute discretion.

**12. VIOLATION, EVICTION AND RE-ENTRY:** The Landlord reserves the right of re-entry. This means that if the Tenant violates the terms of this Lease, the Landlord may terminate this Lease and regain possession of the Property. This is done by a court proceeding known as an eviction. A complaint is served upon the Tenant and the Tenant must appear in court. The Landlord may also evict the Tenant for any other cause which is permitted by applicable law. When the eviction proceeding is concluded, the Landlord may regain possession of the Property.

**13. DAMAGES:** The Tenant is liable for all the Landlord's damages caused by the Tenant's breach of this Lease. Such damages may include loss of rent, the cost of preparing the Property for re-renting and a brokerage commission incurred finding a new tenant as a result of the Tenant's eviction or if the Tenant moves out prior to the end of the Term.

**14. QUIET ENJOYMENT:** The Tenant may occupy the Property without interference, subject to Tenant's compliance with the Terms of this Lease.

**15. TENANT'S REPAIRS AND MAINTENANCE:** The Tenant shall:
(a) Pay for all repairs, replacements and damages caused by the act or neglect of the Tenant, the Tenant's family, domestic employees, guests or visitors, which includes but is not limited to sewer and plumbing drainage problems caused by the Tenant.
(b) Keep and maintain the Property in a neat, clean, safe and sanitary condition.
(c) Cut the grass and maintain the shrubbery.
(d) Drive and park vehicles only in designated areas, if any.
(e) Take good care of the Property and all equipment, fixtures, carpeting and appliances located in it.
(f) Keep the furnace clean, and regularly change the furnace filters, if applicable.
(g) Keep nothing in the Property which is flammable, dangerous or which might increase the danger of fire or other casualty.
(h) Promptly notify the Landlord of any condition which requires repairs to be done.
(i) Use the electric, plumbing and other systems and facilities in a safe manner.
(j) Promptly remove all garbage and recyclables from the Property and place it at the curb (or other designated area) in the proper containers in accordance with the prescribed pick-up schedule.
(k) Not engage in any activity which may cause a cancellation or an increase in the cost of the Landlord's insurance coverages.
(l) Use no more electricity than the receptacles, wiring or feeders to the Property can safely carry.
(m) Obey all instructions, written or otherwise, of the Landlord for the care and use of appliances, equipment and other personal property.
(n) Do nothing to destroy, deface or damage any part of the Property.
(o) Promptly comply with all orders and rules of the Board of Health or any other governmental authority which are directed to the Tenant.
(p) Do nothing which interferes with the use and enjoyment of neighboring properties.
(q) Do nothing to cause any damage to any trees or landscaping on the Property.
(r) Keep the walks and driveway free from dirt, debris, snow, ice and any hazardous objects.
(s) Comply with such rules and regulations that may be published from time to time by the Landlord.

**16. LANDLORD REPAIRS:** The Landlord shall make any necessary repairs and replacements to the vital facilities serving the Property, such as the heating, plumbing and electrical systems, within a reasonable time after notice by the Tenant. The Tenant may be liable for the cost of such repairs and replacements pursuant to Section 15. The Landlord shall not be liable for interruption of services or inconvenience resulting from delays in making repairs or replacements if due to circumstances beyond Landlord's reasonable control.

**17. ACCESS TO THE PROPERTY:** The Landlord shall have access to the Property on reasonable notice to the Tenant in order to (a) inspect the interior and exterior of the Property, (b) make necessary repairs, alterations, or improvements, (c) supply services, and (d) show it to prospective buyers, appraisers, contractors or insurers. The Landlord may enter the Property without prior notice in the event of an emergency or if the Tenant is not home for more than seven consecutive days. If this Lease is not renewed as per Section 27 of this

Tenant's Initials: _____  Landlord's Initials: _____

160  Lease Agreement, Landlord shall then be allowed access to the Property at any time prior to the end of the Term for showing of Property
161  to prospective tenants.

162

163  **18. NO ALTERATIONS OR INSTALLATION OF EQUIPMENT:**  The Tenant may not alter or change the Property without first
164  obtaining Landlord's written consent. By way of example, the Tenant may not:
165  (a) Install any improvement such as carpeting, paneling, floor tiles, or any other improvement which is nailed or tacked down, cemented
166  or glued in;
167  (b) Install any locks or chain guards;
168  (c) Wallpaper, affix wall coverings or other permanent type decorations;
169  (d) Install or change the electrical, plumbing, heating or air cooling system.
170  When painting (whether interior or exterior), the Tenant must have the Landlord's permission regarding paint colors. All painting must
171  be done in a professional and workmanlike manner. The Tenant shall repair all walls and ceilings which had pictures or fixtures attached,
172  prior to vacating. Any and all changes, additions or improvements made without the Landlord's written consent shall be removed by the
173  Tenant on demand by the Landlord. The Property shall be in substantially the same condition at the end of the Term as it was at the
174  beginning of the Term, reasonable wear and tear excepted.
175  All permitted changes, additions and improvements shall become the property of the Landlord when completed, shall be fully paid
176  for by the Tenant, and shall remain as part of the Property at the end of the Term of this Lease, unless the Landlord demands that the
177  Tenant remove them. The Tenant shall not allow any construction lien or other claim to be filed against the Property. If any such lien or
178  claim is filed against the Property, the Tenant shall have it promptly removed.

179

180  **19. INSPECTION:**  If the municipality requires a continued use inspection or certificate of occupancy prior to occupancy, the Land-
181  lord shall be responsible for obtaining such inspections and certificates as well as making the necessary repairs.

182

183  **20. INSURANCE:**  The Tenant shall be responsible for obtaining, at Tenant's own cost and expense, a tenant's insurance policy for
184  the Tenant's furniture, furnishings, clothing and other personal property. The Tenant's personal property shall not be the responsibility
185  of the Landlord, and will not be insured by the Landlord. The Tenant's insurance policy must also include liability coverage. Upon request,
186  the Tenant shall periodically furnish Landlord with evidence of Tenant's insurance policy.

187

188  **21. FIRE AND OTHER CASUALTY:**  Immediate notice shall be given by the Tenant to Landlord of any fire or other casualty which
189  occurs at the Property. If the Property is uninhabitable, Tenant's obligation to pay rent shall cease until the time that the Property is re-
190  stored by the Landlord. If only a part of the Property is uninhabitable, then the rent shall be adjusted proportionately.
191  If only part of the Property is damaged, the Landlord shall repair the Property within a reasonable period of time. Landlord shall not
192  be obligated to repair or restore any improvements that Tenant has made to the Property.
193  Either party may cancel this Lease if the Property is so damaged by fire or other casualty that the property cannot be repaired within
194  90 days. The Landlord's determination in such regard shall be final, conclusive and binding on both parties.
195  The Lease shall end if the Property is totally destroyed. The Tenant shall pay rent to the date of destruction.
196  If the fire or other casualty is caused by the act or neglect of the Tenant, the Tenant's family, domestic employees, guests or visitors, the
197  Tenant shall pay for all repairs and other damages.

198

199  **22. LIABILITY OF LANDLORD AND TENANT:**  The Landlord is not legally responsible for any loss, injury or damage to any
200  person or property unless such loss, injury or damage is directly caused by the Landlord's negligence. The Tenant is legally responsible
201  for loss, injury or damage to any person or property caused by the negligence of the Tenant, the Tenant's family members, domestic
202  employees, guests or visitors.

203

204  **23. PETS:**  No dogs, cats or other pets shall be permitted on the Property without the prior written consent of the Landlord, which the
205  Landlord may withhold in the Landlord's sole and absolute discretion.

206

207  **24. NOTICES:**  All notices given under this Lease must be in writing in order to be effective. Delivery of notices may not be refused.
208  If any notice is refused, it shall be considered to have been effectively given. Notices shall be given by (a) personal delivery, or (b) certified
209  mail, return receipt requested, unless applicable law requires a different means of notice. Notices to the Landlord shall be at the address
210  on the first page of this Lease, and to the Tenant at the Property.

211

212  **25. NO WAIVER:**  The Landlord's failure to enforce any obligation of the Tenant contained in this Lease in any one instance shall
213  not prevent the Landlord from enforcing the obligation at a later time.

214

215  **26. SEVERABILITY:**  If any term or condition of this Lease is contrary to law, the remainder of the Lease shall be unaffected and
216  shall continue to be binding upon the parties.

217

218  **27. RENEWAL OF LEASE:**  The Tenant must be offered a renewal of this Lease by the Landlord, unless the Landlord has good
219  cause not to do so under applicable law. Reasonable changes may be included in the renewal Lease. Not less than _____ days

| Tenant's | Landlord's |
|---|---|
| Initials: _____ | Initials: _____ |

220 before the expiration of the Term of this Lease, the Landlord shall notify the Tenant of the proposed terms for the renewal Lease. Within
221 _____ days after the Tenant receives the Landlord's renewal notice, Tenant shall notify Landlord whether Tenant accepts or re-
222 jects the proposed renewal Lease. If the Tenant does not notify the Landlord of Tenant's acceptance, then the Landlord's proposal shall
223 be considered to have been rejected. If the Tenant does not accept the renewal Lease, the Tenant must vacate the Property at the end of
224 the Term.

226 **28. FURNITURE:**  If the Property is leased in furnished condition, or if the Landlord leaves personal property to be used by the
227 Tenant, the Tenant shall maintain the furniture and furnishings in good condition and repair. A list of such items shall be attached to this
228 Lease and signed by the Landlord and the Tenant.

230 **29. END OF TERM:**  At the end of the Term, the Tenant shall (a) leave the Property clean, (b) remove all of the Tenant's property,
231 (c) repair any damage including that caused by moving, (d) make arrangements for final utility readings and pay all final utility bills and
232 (e) vacate the Property and return it with all keys to the Landlord in the same condition as it was at the beginning of the Term, except for
233 normal wear and tear.

235 **30. ASSOCIATION BYLAWS, RULES AND REGULATIONS:**  If Property is subject to any Association Bylaws
236 and Rules and Regulations, Tenant agrees to comply with such Association Bylaws and Rules and Regulations including
237 any amendments.

239 **31. BINDING:**  This Lease is binding on the Landlord and the Tenant and all parties who lawfully succeed to their rights and respon-
240 sibilities.

242 **32. ENTIRE AGREEMENT:**  This Lease contains the entire agreement of the Landlord and Tenant. No representations have been
243 made by the Landlord or its real estate broker or agents except as set forth in this Lease. This Lease can only be changed in writing by an
244 agreement signed by both the Landlord and the Tenant.

246 **33. ATTORNEY REVIEW CLAUSE:**
247 **(1) Study by Attorney.**
248    The Tenant or the Landlord may choose to have an attorney study this Lease. If an attorney is consulted, the attorney must complete
249 his or her review of the Lease within a three-day period. This Lease will be legally binding at the end of this three-day period unless an
250 attorney for the Tenant or the Landlord reviews or disapproves of the Lease.
251 **(2) Counting the Time.**
252    You count the three days from the date of delivery of the signed Lease to the Tenant and the Landlord. You do not count Saturdays,
253 Sundays or legal holidays. The Tenant and the Landlord may agree in writing to extend the three-day period for attorney review.
254 **(3) Notice of Disapproval.**
255    If an attorney for the Tenant or  Landlord reviews and disapproves of this Lease, the attorney must notify the Broker(s) and the other
256 party named in this Lease within the three-day period. Otherwise this Lease will be legally binding as written. The attorney must send the
257 notice of disapproval to the Broker(s) by fax, email, personal delivery, or overnight mail with proof of delivery. Notice by overnight mail
258 will be effective upon mailing.  The  personal delivery will be effective upon delivery to the Broker's office. The attorney may also, but need
259 not, inform the Broker(s) of any suggested revision(s) in the Lease that would make it satisfactory.

261 **34. BROKER'S COMMISSION:**  The Broker's Commission is earned, due and payable upon signing of a fully executed Lease
262 Agreement and satisfaction of the Attorney Review Period set forth in Section 33 of this Lease.  The Commission shall be paid by the
263    ❑ Landlord in accord with previously executed Listing Agreement.

265    ❑ Tenant and shall be payable as follows:_____

267 _____

268 _____
269       NOT APPLICABLE
270 Listing Broker

272 _____      _____
273 Address                                                                    Telephone#

275 _____      _____      _____
276 Email Address                        Cell Phone#                      Fax#

278 _____      _____
279 Participating Broker                                                 Commission

Tenant's
Initials: _____

Landlord's
Initials: _____

_____        _____
Address                                                 Telephone #

_____        _____        _____
Email Address                                   Cell Phone#                 Fax#

**35. LEAD-BASED PAINT DOCUMENT ACKNOWLEDGMENT: (Applies to dwellings built before 1978)**
The Tenant acknowledges receipt of the EPA pamphlet, "Protect Your Family From Lead In Your Home". Moreover, a copy of the document entitled, "Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards" has been fully completed, signed by Tenant, Landlord and Broker(s) and is appended to and made a part of this Agreement.

**36. WINDOW GUARD NOTIFICATION:**
THE OWNER (LANDLORD) IS REQUIRED BY LAW TO PROVIDE, INSTALL AND MAINTAIN WINDOW GUARDS IN THE APARTMENT IF A CHILD OR CHILDREN 10 YEARS OF AGE OR YOUNGER IS, OR WILL BE, LIVING IN THE APARTMENT OR IS, OR WILL BE, REGULARLY PRESENT THERE FOR A SUBSTANTIAL PERIOD OF TIME IF THE TENANT GIVES THE OWNER (LANDLORD) A WRITTEN REQUEST THAT THE WINDOW GUARDS BE IN-STALLED. THE OWNER (LANDLORD) IS ALSO REQUIRED, UPON THE WRITTEN REQUEST OF THE TENANT, TO PROVIDE, INSTALL AND MAINTAIN WINDOW GUARDS IN THE HALLWAYS TO WHICH PERSONS IN THE TEN-ANT'S UNIT HAVE ACCESS WITHOUT HAVING TO GO OUT OF THE BUILDING. IF THE BUILDING IS A CONDO-MINIUM, COOPERATIVE OR MUTUAL HOUSING BUILDING, THE OWNER (LANDLORD) OF THE APARTMENT IS RESPONSIBLE FOR INSTALLING AND MAINTAINING WINDOW GUARDS IN THE APARTMENT AND THE AS-SOCIATION IS RESPONSIBLE FOR INSTALLING AND MAINTAINING WINDOW GUARDS IN HALLWAY WINDOWS. WINDOW GUARDS ARE ONLY REQUIRED TO BE PROVIDED IN FIRST FLOOR WINDOWS WHERE THE WINDOW SILL IS MORE THAN SIX FEET ABOVE GRADE OR THERE ARE OTHER HAZARDOUS CONDITIONS THAT MAKE INSTALLATION OF WINDOW GUARDS NECESSARY TO PROTECT THE SAFETY OF CHILDREN.

**37. MEGAN'S LAW STATEMENT:**
UNDER NEW JERSEY LAW, THE COUNTY PROSECUTOR DETERMINES WHETHER AND HOW TO PROVIDE NOTICE OF THE PRESENCE OF CONVICTED SEX OFFENDERS IN AN AREA. IN THEIR PROFESSIONAL CAPACI-TY, REAL ESTATE LICENSEES ARE NOT ENTITLED TO NOTIFICATION BY THE COUNTY PROSECUTOR UNDER MEGAN'S LAW AND ARE UNABLE TO OBTAIN SUCH INFORMATION FOR YOU. UPON CLOSING, THE COUNTY PROSECUTOR MAY BE CONTACTED FOR SUCH FURTHER INFORMATION AS MAY BE DISCLOSABLE TO YOU.

**38. CONSUMER INFORMATION STATEMENT ACKNOWLEDGMENT:** By signing below, the Landlord and Tenant acknowledge they received the Consumer Information Statement on New Jersey Real Estate Relationships from the brokerage firms involved in this transaction prior to the first showing of the Property.

**39. DECLARATION OF LICENSEE BUSINESS RELATIONSHIP(S):**
A. _____, (name of firm) AND _____ (name(s) of licensee(s)) AS ITS AUTHORIZED REPRESENTATIVE(S) ARE WORKING IN THIS TRANSACTION AS (choose one) ❑ LANDLORD'S AGENTS ❑ TENANT'S AGENTS ❑ DISCLOSED DUAL AGENTS ❑ TRANSACTION BROKERS.
B. INFORMATION SUPPLIED BY _____(name of other firm) HAS INDICATED THAT IT IS OPERATING IN THIS TRANSACTION AS A (choose one) ❑ LANDLORD'S AGENT ONLY ❑ TENANT'S AGENT ONLY ❑ DISCLOSED DUAL AGENT ❑ TRANSACTION BROKER.

**40. ACKNOWLEDGMENT OF TRUTH IN RENTING STATEMENT: (Applies to all Tenants with a rental term of at least one month living in residences with more than two dwelling units or more than three if the Landlord occupies one.)** By signing below, Tenant acknowledges receipt of the booklet, "Truth In Renting - A guide to the rights and responsibilities of residential tenants and landlords in New Jersey".

**41. SMOKE DETECTORS, CARBON MONOXIDE ALARM AND PORTABLE FIRE EXTINGUISHER COMPLIANCE:**
The Certificate of smoke detectors, carbon monoxide alarm and portable fire extinguisher compliance (CSDCMAPFEC), as required by law, shall be the responsibility of the Landlord. If such alarms are battery operated, the Tenant shall be responsible for their maintenance.

**42. PRIVATE WELL TESTING: (This section is applicable if the Property's potable water supply is provided by a private well for which testing of the water is not required by any State law other than the Private Well Testing Act (the "Act" - N.J.S.A. 58:12A-26 to 37).** By March 14, 2004, and at least once every five years thereafter, the Landlord is required to test the potable water supply for the Property in accordance with the Act. Within thirty (30) days after receiving the test results, the Landlord shall

Tenant's
Initials: _____

Landlord's
Initials: _____

340 provide a written copy thereof to the Tenant. Also, the Landlord is required to provide a written copy of the most recent test results to
341 any new tenant at the Property. If the Property is for "seasonal use or rental," the Landlord shall either post the tests results in a readily
342 visible location inside of the Property or provide a written copy thereof to the tenant. A "seasonal use or rental" means use or rental for
343 a term of not more than 125 consecutive days for residential purposes by a person having a permanent place of residence elsewhere. By
344 signing below, Tenant acknowledges receipt of a written copy of the test results, or in the case of a seasonal rental, if it has not received
345 the test results, acknowledges the posting thereof inside of the Property in accordance with the Act.

346

347 **43. SECURITY CAMERAS:**
348 If there are any security cameras on the Property, including but not limited to what often are called "nanny cams" or other video or
349 audio taping equipment, the Landlord represents that the security cameras will be disabled and not functioning during the Term of this
350 Lease unless only the Tenant has the use of the security cameras and neither the Landlord nor any other party has access to or the use
351 of it. The Landlord acknowledges that any use or access to the security system by the Landlord or any other party during the tenancy
352 may constitute an invasion of privacy of the Tenant and subject the Landlord to civil damages and criminal charges. Specifically
353 excluded from this Section are such security cameras in multi-family housing that are in common areas, such as common hallways, the
354 exterior of the building(s), entrance ways to the building(s), common laundry rooms, or common parking lots or garages.

355

356 **44. MEGAN'S LAW REGISTRY:** Tenant is notified that New Jersey law establishes an Internet Registry of Sex Offenders that may
357 be accessed at www.njsp.org.

358

359 **45. OTHER LEASE PROVISIONS, IF ANY:**

360
361
362
363
364
365
366
367
368
369
370
371
372
373
374
375
376
377
378
379
380
381
382
383
384
385
386
387
388
389
390
391
392
393
394
395
396
397
398
399

Tenant's
Initials: _____

Landlord's
Initials: _____

400 CONTINUED, OTHER LEASE PROVISIONS, IF ANY:
401
402
403
404
405
406
407
408
409
410
411
412
413
414
415
416
417
418
419
420
421
422
423
424
425
426
427
428
429
430
431
432 WITNESS:
433
434
435 _____  _____  _____
   Landlord                     Date
436
437
438 _____  _____  _____
   Landlord                     Date
439
440
441 _____  _____  _____
   Landlord                     Date
442
443
444 _____  _____  _____
   Landlord                     Date
445
446
447 _____  _____  _____
   Tenant                       Date
448
449
450 _____  _____  _____
   Tenant                       Date
451
452
453 _____  _____  _____
   Tenant                       Date
454
455
456 _____  _____  _____
   Tenant                       Date
457
458
459

**Tenant's**
**Initials:** _____

**Landlord's**
**Initials:** _____

CHOATES GENERAL CONTRACTING
FIVE YEAR CASH FLOW - DRAFT

| | | 2022 | 2023 | 2024 | 2025 | 2026 | % | Total |
|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | |
| Contract Revenue | a | $ 4,357,172 | $ 19,345,133 | $ 35,654,474 | $ 37,457,553 | $ 35,225,913 | 93.0% | $ 132,040,244 |
| Over/Under Billing Adjustments | b | $ 217,859 | $ 967,257 | $ 1,782,724 | $ 1,872,878 | $ 1,761,296 | 5.0% | $ 6,602,012 |
| Rent income - Mullica Hill | c | $ 60,000 | $ 60,000 | | | | 2.0% | $ 120,000 |
| TOTAL INCOME | 1 | $ 4,635,030 | $ 20,372,389 | $ 37,437,197 | $ 39,330,430 | $ 36,987,209 | 100.0% | $ 138,762,256 |
| | | | | | | | | |
| **COST OF CONSTRUCTION** | d | | | | | | | |
| Job Labor | | $ (503,253) | $ (2,234,363) | $ (4,118,092) | $ (4,326,347) | $ (4,068,593) | 11.0% | $ (15,250,648) |
| Job Material | | $ (1,006,507) | $ (4,468,726) | $ (8,236,183) | $ (8,652,695) | $ (8,137,186) | 22.0% | $ (30,501,296) |
| Job Sub-Contract | | $ (1,143,758) | $ (5,078,097) | $ (9,359,299) | $ (9,832,608) | $ (9,246,802) | 25.0% | $ (34,660,564) |
| Job Miscellaneous | | $ (457,503) | $ (2,031,239) | $ (3,743,720) | $ (3,933,043) | $ (3,698,721) | 10.0% | $ (13,864,226) |
| Job Insurance | | $ (411,753) | $ (1,828,115) | $ (3,369,348) | $ (3,539,739) | $ (3,328,849) | 9.0% | $ (12,477,803) |
| TOTAL COST OF CONSTRUCTION | 2 | $ (3,522,773) | $ (15,640,540) | $ (28,826,642) | $ (30,284,431) | $ (28,480,151) | 77.0% | $ (106,754,537) |
| | | | | | | | | |
| Cost of Goods Sold % | 3=2/1 | 76% | 77% | 77% | 77% | 77% | | 77% |
| | | | | | | | | |
| Gross Profit | 4=1-2 | $ 1,112,257 | $ 4,731,850 | $ 8,610,555 | $ 9,045,999 | $ 8,507,058 | 177.0% | $ 32,007,719 |
| | | | | | | | | |
| **GENERAL & ADMINISTRATIVE EXPENSES** | | | | | | | | |
| External G&A Expenses | e | | | | | | | |
| Insurance | | $ (4,575) | $ (20,312) | $ (37,437) | $ (39,330) | $ (36,987) | 0.1% | $ (138,642) |
| Office Expense | | $ (22,875) | $ (101,562) | $ (187,186) | $ (196,652) | $ (184,936) | 0.5% | $ (693,211) |
| Payroll Taxes | | $ (60,088) | $ (266,783) | $ (491,700) | $ (516,566) | $ (485,790) | 1.3% | $ (1,820,927) |
| Rent | | $ (45,750) | $ (203,124) | $ (374,372) | $ (393,304) | $ (369,872) | 1.0% | $ (1,386,423) |
| Salaries | | $ (274,502) | $ (1,218,743) | $ (2,246,232) | $ (2,359,826) | $ (2,219,233) | 6.0% | $ (8,318,535) |
| Telephone | | $ (2,288) | $ (10,156) | $ (18,719) | $ (19,665) | $ (18,494) | 0.1% | $ (69,321) |
| Utilities | | $ (45,750) | $ (203,124) | $ (374,372) | $ (393,304) | $ (369,872) | 1.0% | $ (1,386,423) |
| Total External G&A Expenses | 5 | $ (455,829) | $ (2,023,805) | $ (3,730,018) | $ (3,918,648) | $ (3,685,184) | 10.0% | $ (13,813,483) |
| | | | | | | | | |
| Internal G&A Expenses | | $ (0) | $ (0) | $ (0) | $ (0) | $ (0) | 0.0% | |
| Bad Debt Expense | | $ (32,679) | $ (290,177) | $ (534,817) | $ (561,863) | $ (528,389) | 3.0% | $ (1,947,925) |
| Insurance | g | $ (13,905) | $ (61,117) | $ (112,312) | $ (117,991) | $ (110,962) | 0.3% | $ (416,287) |
| Office Expense | h | $ (36,000) | $ (39,600) | $ (43,560) | $ (47,916) | $ (52,708) | 0.5% | $ (219,784) |
| Payroll Taxes | i | $ (21,222) | $ (23,344) | $ (25,678) | $ (28,246) | $ (31,071) | 1.0% | $ (129,561) |
| Professional fees | j | $ (60,000) | $ (66,000) | $ (72,600) | $ (79,860) | $ (87,846) | 4.0% | $ (366,306) |
| Rent | k | $ (156,000) | $ (360,000) | $ (264,000) | $ (216,000) | $ (216,000) | 1.0% | $ (1,212,000) |
| Salaries | l | $ (96,947) | $ (106,642) | $ (117,306) | $ (129,036) | $ (141,940) | 3.0% | $ (591,871) |
| Telephone | m | $ (15,600) | $ (18,000) | $ (13,200) | $ (10,800) | $ (10,800) | 0.1% | $ (68,400) |
| Utilities | n | $ (46,800) | $ (54,000) | $ (39,600) | $ (32,400) | $ (32,400) | 0.0% | $ (205,200) |
| Reserve for contingencies | | | $ (782,027) | $ (1,441,332) | $ (1,514,222) | $ (1,424,008) | | $ (5,161,588) |
| Payments to Sub-chapter V Trustee | r | $ (60,000) | $ (120,000) | $ (144,000) | $ (144,000) | $ (144,000) | | $ (612,000) |
| Total Internal G&A Expenses | 6 | $ (539,153) | $ (1,920,907) | $ (2,808,405) | $ (2,882,335) | $ (2,780,122) | | $ (10,930,921) |
| NET INCOME BEFORE TAXES | 7=4-5-6 | $ 117,276 | $ 787,138 | $ 2,072,133 | $ 2,245,016 | $ 2,041,752 | | $ 7,263,315 |
| Taxes on gain from sale of secured properties 20% | 8 | $ (64,545) | $ (105,127) | $ - | $ - | $ - | | $ (169,673) |
| Taxes (35%) | 9 | $ (41,047) | $ (275,498) | $ (725,246) | $ (785,756) | $ (714,613) | | $ (2,542,160) |
| NET INCOME | 10=7-8-9 | $ 11,684 | $ 406,513 | $ 1,346,886 | $ 1,459,261 | $ 1,327,139 | | $ 4,551,482 |

Bederson LLP 10/19/2021

CHOATES GENERAL CONTRACTING
FIVE YEAR CASH FLOW - DRAFT

| | | 2022 | 2023 | 2024 | 2025 | 2026 | % | Total |
|---|---|---|---|---|---|---|---|---|
| **Adjustments** | | | | | | | | |
| AR collections | s | $ (1,363,244) | $ (2,511,664) | $ (4,615,545) | $ (4,848,957) | $ (4,560,067) | | $ (17,899,478) |
| AR collections - reversal | s | | $ 1,363,244 | $ 2,511,664 | $ 4,615,545 | $ 4,848,957 | | $ 13,339,411 |
| AP payments | t | $ 1,624,770 | $ 2,926,908 | $ 5,272,508 | $ 5,527,794 | $ 5,210,046 | | $ 20,562,026 |
| AP payments - reversal | t | | $ (1,624,770) | $ (2,926,908) | $ (5,272,508) | $ (5,527,794) | | $ (15,351,980) |
| Capital Expenditure Needs | | $ (5,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | | $ (205,000) |
| **Total Adjustments** | 11 | $ 256,526 | $ 103,717 | $ 191,720 | $ (28,126) | $ (78,859) | | $ 444,979 |
| **Net cash available** | 12= 10+11 | $ 268,210 | $ 510,230 | $ 1,538,606 | $ 1,431,135 | $ 1,248,280 | | $ 4,996,461 |
| | | | | | | | | |
| **Sale of Properties, net of expenses** | u | | | | | | | |
| Class 1 - 122 Danton Lane, Mullica Hill, NJ | | | $ 582,800 | | | | | $ 582,800 |
| Class 2 - 4, 8 - 5300 Master Street, Philadelphia, PA | | $ 188,000 | | | | | | $ 188,000 |
| Class 5 - 73 West Road, Gibbsboro, NJ | | | $ 277,300 | | | | | $ 277,300 |
| Class 6 - 13 Riviera Drive, Pennsville, NJ | | $ 105,600 | | | | | | $ 105,600 |
| Class 7 - 120 Peace Lane, Glassboro, NJ | | $ 272,600 | | | | | | $ 272,600 |
| 401 Cooper Landing Rd., Suite C-4, Cherry Hill, NJ | | $ 92,120 | | | | | | $ 92,120 |
| **Total Sale of Properties, net of expenses** | 13 | $ 658,320 | $ 860,100 | $ - | $ - | $ - | | $ 1,518,420 |
| **Secured Debts to be Paid** | | | | | | | | |
| Class 1 - 122 Danton Lane, Mullica Hill, NJ | | $ 409,465 | $ 409,465 | | | | | $ 409,465 |
| Class 2 - 4, 8 - 5300 Master Street, Philadelphia, PA | | $ 341,249 | $ 341,249 | | | | | $ 341,249 |
| Class 5 - 73 West Road, Gibbsboro, NJ | | $ 213,266 | | $ 213,266 | | | | $ 213,266 |
| Class 6 - 13 Riviera Drive, Pennsville, NJ | | $ 16,053 | $ 16,053 | | | | | $ 16,053 |
| Class 7 - 120 Peace Lane, Glassboro, NJ | | $ 52,424 | $ 52,424 | | | | | $ 52,424 |
| 401 Cooper Landing Road, Suite C-4, Cherry Hill | | $ 60,000 | $ 60,000 | | | | | $ 60,000 |
| **Total Secured Debts to be Paid** | 14 | $ 1,092,456 | $ 469,726 | $ 622,730 | $ - | $ - | | $ 1,092,456 |
| **Net Proceeds from Sale of Secured Property** | 15=13-14 | | $ 188,594 | $ 237,370 | $ - | $ - | | $ 425,964 |
| | | | | | | | | |
| Proceeds to Sub-Chapter V Trustee for disbursements | w | | $ (150,875) | $ (189,896) | $ - | $ - | | $ (340,771) |
| Remainder of proceeds for payment of taxes/fund operations | x | | $ 37,719 | $ 47,474 | $ - | $ - | | $ 85,193 |
| **Net Cash Flow** | 16=12-x | $ 305,929 | $ 557,704 | $ 1,538,606 | $ 1,431,135 | $ 1,248,280 | | $ 5,081,654 |
| | | | | | | | | |
| beginning cash | | $ - | $ 305,929 | $ 863,632 | $ 2,402,238 | $ 3,833,373 | | $ - |
| ending cash | | $ 305,929 | $ 863,632 | $ 2,402,238 | $ 3,833,373 | $ 5,081,654 | | $ 5,081,654 |
| | | | | | | | | |
| **Payments to Sub-Chapter V Trustee** | | | | | | | | |
| Debtor Payments to Sub-Chapter V Trustee | y | | $ 60,000 | $ 120,000 | $ 144,000 | $ 144,000 | $ 144,000 | $ 612,000 |
| Amount return to debtor, held for reserves | | | | | | $ (400,367) | | $ (400,367) |
| Proceeds from Sale of Secured Property | | | $ 150,875 | $ 189,896 | $ - | $ - | | $ 340,771 |
| **Total Payments to Sub-Chapter V Trustee** | | | $ 210,875 | $ 309,896 | $ 144,000 | $ 144,000 | $ (256,367) | $ 552,404 |
| | | | | | | | | |
| **Remaining Claims to be Paid** | | | | | | | | |
| Priority tax claim | | $ 1,671 | $ 1,671 | | | | | $ 1,671 |
| Trustee Commissions | o | $ 28,583 | $ 6,326 | $ 9,297 | $ 4,320 | $ 4,320 | $ 4,320 | $ 28,583 |
| admin expenses | | | | | | | | |
| Attorney for Trustee | p | $ 35,000 | $ 35,000 | | | | | $ 35,000 |
| Accountant for Trustee | q | $ 22,000 | $ 22,000 | | | | | $ 22,000 |
| Gen Uns. | | $ 465,150 | $ 53,674 | $ 110,703 | $ 139,680 | $ 139,680 | $ 21,413 | $ 465,150 |
| **Total Unsecured to be Paid** | | $ 552,404 | $ 118,671 | $ 120,000 | $ 144,000 | $ 144,000 | $ 25,733 | $ 552,404 |
| | | | | | | | | |
| **Total Claims** | | $ 1,644,861 | $ 588,397 | $ 742,730 | $ 144,000 | $ 144,000 | $ 25,733 | $ 1,644,861 |

Bederson LLP 10/19/2021

**CHOATES GENERAL CONTRACTING**
**FIVE YEAR CASH FLOW - DRAFT**

| | 2022 | 2023 | 2024 | 2025 | 2026 | % | Total |
|---|---|---|---|---|---|---|---|

a.  Projected Revenue calculated at  7.5%, 7.5%, 10%, 12.5% and 15% of the of standard invoice AIA pay applications for each year at the start of a funded project, after

b.  Billing adjustments are a draw based on projected profits from projects, adjusted to 5% of contract revenue.

c.  Per plan - upon confirmation of the plan, Debtor's principal is to pay the Debtor $5,000 per month to the Debtor for rent of use of 122 Danton Lane which is to be sold

d.  Cost of Construction based on a percentage, by category, of total expenses for a given year.  Amounts are based in industry standards, per square feet of new
construction costs and renovation per square feet cost.

e.  External SGA expenses on percentage of total external expenses.

f.  Bad Debt expenses adjusted to 1.5% of contract revenue

g.  Insurance calculated at .3% of total income

h.  Office expense at $3000/month, adjusted upwards at 10% each year.

i.  Payroll taxes calculated at 21.89% of salary

j.  Professional fees calculated at $5,000 per month, adjust upwards at 10% per year.

k.  Rent calculated at $2,000 per month, times current number of jobs

l.  Salary for 2022 based on average of salaries per 2018 and 2019 tax returns, adjusted upwards at 10$ per year

m.  Telephone at $100/month times number of current jobs

n.  Utilities calculated at $300 per month times number of current jobs.

o.  Trustee commissions calculated at 3% of disbursements to general unsecured creditors

p.  Attorney for the Trustee estimated at $35,000 total

q.  Accountant for the Trustee estimated at $22,000

r.  Payments to sub-chapter V Trustee for payment of general unsecured claims

s.  Billing time frame is 30-50 days.  Collections are made every 30-60 days.  A special request draw can be authorized and agreed on from owner and agency.  An average

t.  An average of 60 days was used.

u.  Sale of properties per Current value of properties per Exhibit A, net of 6% sales expense

v.  Secured debts to be paid from sale of property.  Per counsel, 5300 Master Street is to be sold with net proceeds to pay toward Philly Properties PC judgment debt

w.  Per plan: Net proceeds from sale of properties $80% for disbursement under the Chapter 11 Plan

x.  Per plan: Net proceeds from sale of properties at 20% for the payment of taxes and to fund operations

y.  Per plan - Amounts to Sub-Chapter V Trustee for disbursement to creditors.

Daniel L. Reinganum
McDowell Law, PC
46 W. Main Street
Maple Shade, NJ 08052
856-482-5544 / DanielR@McDowellLegal.com
*Attorneys for Choates G. Contracting, LLC, Chapter 11 Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE:** | **Case No.: 21-13085-ABA** |
| **Choates G. Contracting, LLC** | **Chapter No.: 11** |
| | **Hearing Date: 3/21/23 @ 10 am** |

### CERTIFICATION IN SUPPORT OF REQUEST TO MODIFY DEBTOR'S CONFIRMED CHAPTER 11 PLAN

I, Darrell Choates, do hereby certify as follows:

1. I am the principal of the Debtor, Choates G. Contracting, LLC.

2. For the reasons set forth below, the Debtor requests that the Court approve a modification of the Debtor's Confirmed Chapter 11 Plan by reducing Plan payments from $10,000 per month in Year 2 to $5,000 per month in Year 2, with payments to accrue starting month 3 of Year 2 (i.e. March 2023).

### The Confirmed Plan

3. On December 22, 2021 the Court confirmed the Debtor's Second Amended Small Business Subchapter V Plan, dated October 19, 2021 pursuant to 11 U.S.C. §1191(b) (the "Plan").

4. The Plan provided for the 100% repayment of all unsecured claims, the surrender in full satisfaction of a number of properties, and 100% repayment of the secured claim of Philly Properties GP, LLC.

5. Under the terms of the Plan, the Debtor was obligated to make monthly

payments to the Sub-Chapter V Trustee as follows:

    a. $5,000 per month in Year 1
    b. $10,000 per month in Year 2
    c. $12,000 per month in Year 3

    TOTAL OF PERIODIC PAYMENTS: $612,000

6. The total plan funding required for the Debtor to make all Plan payments[1] (without allowance for post-confirmation administrative expenses) was $605,611.19. *See Exhibit A, Attached hereto.*

7. The Plan also required that real estate located at 122 Danton Lane, Mullica Hill, New Jersey be sold within one year of confirmation.

8. The Plan provided for the sale of other real estate, commonly known as 120 Peace Lane, 13 Riviera Drive, 703 West Road, and 5300 Master Street.

9. However, the Plan was originally set up so that even if no proceeds were realized from the sale of real estate, there would be sufficient funding to pay all required creditors in full. Stated differently – the Plan was set up to be overfunded from the start.

10. The Debtor closed on the sale of 122 Danton Lane, Mullica Hill, New Jersey on December 23, 2022 and as a result, a total of $110,694.97 was applied to the Debtor's Plan obligations.[2] *See Exhibit B, HUD Closing Statement.*

11. The Debtor made all required Plan payments for Year 1, totaling $60,000.

12. In total, post-confirmation, the Debtor has made payments and sold property such that the total amount paid out to creditors under the Plan is $170,694.97.

13. This leaves a remaining Plan balance of $434,916.22, without including post-confirmation professional expenses.

14. McDowell Law, PC has recently submitted a fee application for post-confirmation fees and expenses which totals $34,688.62. No similar application has been filed

---

[1] This figure includes the post-confirmation addition of a $6,700 general unsecured claim for Turnkey Management Corp. and a $18,565 general unsecured claim for Scott E. Braidwood.

[2] Philly Properties GP, LLC received $88,555.98 at settlement (Line 1306, Exhibit B), Douglas Stanger Sub-V Trustee received $17,711.20 at settlement for distribution (Line 1307, Exhibit B), and the Debtor received $4,427.79 at settlement (Line 1309, Exhibit B) – however, by agreement with Philly Properties GP, LLC, this $4,427.79 was paid over to Philly Properties GP, LLC.

by the Sub-Chapter V Trustee, but for purposes of this Motion, it will be assumed to be no more than $12,000.

15. Adding these projected post-confirmation professional expenses to the Plan yields an adjusted remaining Plan balance of $481,604.84.

16. The total amount to be paid as Periodic Payments in Years 2-5 of the plan is $552,000.

17. The Chapter 11, Subchapter V Debtor's First Post-Confirmation Modified Plan of Reorganization Date March 16, 2023 (the 'Modified Plan') proposes to reduce Periodic Plan Payments from $10,000 per month in Year 2 to $5,000 per month, starting Month 3 of Year 2 (March 2023). This modification will result in $70,000 less being paid through Periodic Payments.

18. Nevertheless, the Plan would still be sufficiently funded, as it would provide for Periodic Payments of $482,000 to satisfy $481,604.84 of remaining Plan obligations (without accounting for any additional reductions due to the sale(s) of real property).

**THE MODIFIED PLAN**

19. In general, I ask the Court to set forth a schedule and deadlines for consideration of a modification to the Plan.

20. The Debtor's source of funding for the Periodic Payments is a combination of the Debtor's revenue, the revenue of other businesses in which I have an ownership interest, and contributions from family members as needed.

21. Unfortunately, the Debtor's revenues have not grown as originally projected and the revenues of my other businesses has not increased sufficiently to comfortably step up the Periodic Payments to $10,000 per month in Year 2. Accordingly the Debtor seeks to modify its Period Payments as set forth in paragraph 17, above.

22. The Plan does not provide deadlines for the sale of 120 Peace Lane, 13 Riviera Drive, 703 West Road, and 5300 Master Street. The proposed Plan modification has deadlines and guidance as to the process for selling these properties, and makes it an event of default if the properties are not sold according to the deadlines set forth in the Modified Plan.

I certify that the above statements are true to the best of my knowledge and ability.

BY: /s/ Darrell Choates                    Date:        March 17, 2023
Darrell Choates
Choates G. Contracting, LLC

Daniel L. Reinganum, Esq.
McDowell Law, PC
46 W. Main Street
Maple Shade, NJ 08052
856-482-5544 / DanielR@McDowellLegal.com
Attorneys for the Debtor

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
| **In re:** | **Case No. 21-13085-ABA** |
| **Choates G. Contracting, LLC** | **Chapter 11** |
| | **Judge: Andrew B. Altenburg, Jr.** |

## CERTIFICATION IN SUPPORT OF CONFIRMATION OF MODIFIED CHAPTER 11 PLAN

Darrell Choates, Sr., principal of the Debtor, does hereby certify as follows, in order to satisfy the requirements of 11 U.S.C. §1191(b), and by reference, 1

### GENERAL AVERMENTS

1. I make this Certification in support of Confirmation of the Chapter 11, Subchapter V Debtor's First Post-Confirmation Modified Plan of Reorganization dated March 16, 2023 (the 'Plan').

2. The Plan complies with the applicable provisions of this title.

3. The proponent of the plan complies with the applicable provisions of this title.

4. The plan has been proposed in good faith and not by any means forbidden by law.

5. The proponent of the plan has disclosed the identify and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy; and the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

6. No governmental regulatory commission has jurisdiction over the rates of the Debtor.

7. With respect to each impaired class of claims or interests, each class has either accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under Chapter 7.

8. With respect to each class of claims or interests, each class has accepted the plan or is not impaired under the plan.

9. The plan complies with the provisions of 11 U.S.C. §1129(a)(9).

10. If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan as accepted the plan, determined without including any acceptance of the plan y any insider.

11. Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12. All fees payable under 28 USC § 1930 as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

13. There are no retiree benefits.

14. The Debtor is not required to pay a domestic support obligation.

15. The Debtor is not an individual.

16. All transfers of property under the plan will be made in accordance with applicable provisions of non-bankruptcy law.

17. By agreement with Philly Properties GP, LLC and Drexel Properties GP, LLC, the original plan was confirmed under 11 U.S.C. §1191(b).

18. Therefore, I ask the Court to confirm the Plan under 11 U.S.C.§1191(b).


BY:   /s/ Darrell Choates, Sr.                    Date:   March 17, 2023
      Darrell Choates, Sr.

Daniel L. Reinganum
McDowell Law, PC
46 W. Main Street
Maple Shade, NJ 08052
856-482-5544 / DanielR@McDowellLegal.com
*Attorneys for Choates G. Contracting, LLC, Chapter 11 Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE:** | **Case No.: 21-13085-ABA** |
| **Choates G. Contracting, LLC** | **Chapter No.: 11** |

## ORDER APPROVING SETTLEMENT MODIFYING TERMS OF CHAPTER 11, SUBCHAPTER V DEBTOR'S FIRST POST-CONFIRMATION MODIFIED PLAN OF REORGANIZATION DATED MARCH 16, 2023 (DOCKET NO. 240)

The relief set forth on the following pages, numbered two (2) through three (3) is hereby **ORDERED**.

1

This matter having been opened to the Court by Choates G. Contracting, LLC, by and through Daniel L. Reinganum, Esq. of McDowell Law, PC for an order Approving Settlement modifying terms of Chapter 11, Subchapter V Debtor's First Post-Confirmation Modified Plan of Reorganization Dated March 16, 2023 (Docket No. 240) (the 'Modified Plan'), (the '<u>Motion</u>') , and the Court having considered any objections thereto, and having overruled any objections thereto, for good cause shown it is on hereby **ORDERED:**

1. The terms of the Settlement with Philly Properties GP, LLC and Drexel Properties GP, LLC  is **APPROVED.**

2. This Order shall be incorporated into any Order confirming the Modified Plan.

3. The Debtor's periodic payment obligation as set forth in Paragraph 2.5.2 of the Modified Plan for the year of 2023 are modified as follows:

    **"Year 2:        No payments until Chapter 11 Modified Plan is confirmed. Within ten (10) days of confirmation, Debtor shall tender a sum to the Subchapter V Trustee equal to $5,000 per month with payments starting March 2023.  (i.e. if confirmed in April 2023, Debtor to tender 2 x $5,000 = $10,000; if confirmed in June 2023, Debtor to tender 4 x $5,000 = $2,000).**

    **Thereafter monthly payments shall be in the amount of $5,500 commencing the first of the month following entry of the order confirming the Chapter 11 Modified Plan."**

4. The treatment of Philly Properties GP, LLC in the Modified Plan is changed and shall be as set forth below:

2

**PHILLY PROPERTIES GP, LLC TREATMENT**

**PER MODIFIED PLAN DATED MARCH 16, 2023**
**AS MODIFIED BY SETTLEMENT WITH KATZ CREDITORS**

| CLASS 8 | *Secured claim of:*<br>Philly Properties GP, LLC<br><br>Collateral description =<br>5300 Master Street<br>Philadelphia, PA; AND<br>Judgment Lien against all other real estate owned by the Debtor.<br><br>Allowed Secured Amount =<br>$245,019<br><br>Priority of lien =<br>2nd position<br>judgment lien<br><br>Principal owed =<br>$ 245,019<br><br>Pre-pet. arrearage =<br>N/A<br><br>Total claim =<br>$ 245,019<br><br>• ** Creditor received approximately $92,983.77 from sale of 122 Danton Lane.<br><br>• ** Creditor carved-out $17,711.20 for Bankruptcy Estatee, which was paid to Sub-V Trustee, resulting in additional $17,711.20 reduction in secured claim, but creation of $17,711.20 general unsecured claim. | NO | IMPAIRED | Treatment of Lien:<br><br>Creditor shall retain their judgment lien in the amount of the Allowed Secured Amount against all properties that are collateral.<br><br>With respect to all real estate owned by the Debtor, whether in Pennsylvania or New Jersey – Creditor shall retain 100% of net proceeds after payment of customary closing costs (including realty commission) and payment of superior liens.<br><br>Amounts previously provided to bankruptcy estate via carve-out gave this Creditor a corresponding unsecured claim against the Debtor.<br><br>In New Jersey, Creditor's judgment lien shall retain its character as a docketed judgment lien. |

United States Bankruptcy Court

District of New Jersey

In re:                                                                                  Case No. 21-13085-ABA

Choates G. Contracting, LLC                                                             Chapter 11

    Debtor

# CERTIFICATE OF NOTICE

| District/off: 0312-1 | User: admin | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Jun 08, 2023 | Form ID: pdf903 | Total Noticed: 3 |

The following symbols are used throughout this certificate:

**Symbol**    **Definition**

+    Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Jun 10, 2023:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Choates G. Contracting, LLC, 122 Danton Lane, Mullica Hill, NJ 08062-4733 |
| aty | + | Bradley K. Sclar, Five Greentree Centre, Suite 104, 525 Route 73 North, Marlton, NJ 08053-3422 |
| aty | + | McDowell Law PC, 46 West Main Street, Maple Shade, NJ 08052-2432 |

TOTAL: 3

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Jun 10, 2023        Signature:      /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on June 8, 2023 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Brad V Shuttleworth | |
| | on behalf of Unknown Role Type Turn-Key Management Corp. brad@shuttleworth-law.com |
| Daniel L Reinganum | |
| | on behalf of Debtor Choates G. Contracting  LLC DanielR@McDowellLegal.com, tcuccuini@mcdowelllegal.com;Lwood@mcdowelllegal.com;kgresh@mcdowelllegal.com;kbrocious@mcdowelllegal.com;djamison@mcdowelllegal.com;cgetz@mcdowelllegal.com;reinganumdr62202@notify.bestcase.com |
| Daniel L Reinganum | |
| | on behalf of Plaintiff Choates G. Contracting  LLC DanielR@McDowellLegal.com, tcuccuini@mcdowelllegal.com;Lwood@mcdowelllegal.com;kgresh@mcdowelllegal.com;kbrocious@mcdowelllegal.com;djamison@mcdowelllegal.com;cgetz@mcdowelllegal.com;reinganumdr62202@notify.bestcase.com |
| Denise E. Carlon | |
| | on behalf of Creditor MidFirst Bank dcarlon@kmllawgroup.com  bkgroup@kmllawgroup.com |

District/off: 0312-1                          User: admin                                    Page 2 of 2
Date Rcvd: Jun 08, 2023                   Form ID: pdf903                              Total Noticed: 3

Douglas S. Stanger

doug.stanger@flastergreenberg.com  diana.janansky@flastergreenberg.com,dss@trustesolutions.net,cdss11@trustesolutions.net

Jacqueline M. Vigilante

on behalf of Interested Party Scott E. Braidwood jacci@thevigilantelawfirm.com

Jeffrey M. Sponder

on behalf of U.S. Trustee U.S. Trustee jeffrey.m.sponder@usdoj.gov  jeffrey.m.sponder@usdoj.gov

Jessica Ann Berry

on behalf of Creditor BSI Financial Services as servicer for IRP Fund II Trust 2A bankruptcy@gmlaw.com

Kyle Francis Eingorn

on behalf of Interested Party COBA  Inc. keingorn@dbblegal.com

Mark S. Haltzman

on behalf of Creditor Drexel Properties GP  LLC mhaltzman@sanddlawyers.com,
kdaley@sanddlawyers.com;rchew@sanddlawyers.com

Mark S. Haltzman

on behalf of Creditor Philly Properties GP  LLC mhaltzman@sanddlawyers.com,
kdaley@sanddlawyers.com;rchew@sanddlawyers.com

Pamela Elchert Thurmond

on behalf of Creditor LAW DEPT CITY OF PHILADELPHIA Pamela.Thurmond@phila.gov  edelyne.jean-baptiste@phila.gov

Steven P. Kelly

on behalf of Creditor U.S. BANK NATIONAL ASSOCIATION skelly@sterneisenberg.com  bkecf@sterneisenberg.com

U.S. Trustee

USTPRegion03.NE.ECF@usdoj.gov

William Carl Katz

on behalf of Creditor Drexel Properties GP  LLC wkatz@sanddlawyers.com,
kdaley@sanddlawyers.com;rchew@sanddlawyers.com

William Carl Katz

on behalf of Creditor Philly Properties GP  LLC wkatz@sanddlawyers.com,
kdaley@sanddlawyers.com;rchew@sanddlawyers.com


TOTAL: 16